UNITED STATES, Appellee,

v.

Eulalio CANDELARIA–SILVA, A/K/A Gatillo Macho, Defendant, Appellant.

United States, Appellee,

v.

Raul Ortiz–Miranda, A/K/A Cano Beeper, Defendant, Appellant.

United States, Appellee,

v.

Moises Candelaria–Silva, Defendant, Appellant.

United States, Appellee,

v.

Celenia Reyes–Padilla, Defendant, Appellant.

United States, Appellee,

v.

Jose A. Rosado–Rosado, Defendant, Appellant.

United States, Appellee,

v.

Nelson Miguel Ortiz–Baez, Defendant, Appellant.

United States, Appellee,

v.

Rosa Morales–Santiago, Defendant, Appellant.

Nos. 96–1711, 96–1712, 96–1713, 96–1714, 96–2275, 96–2362, 96–2364.

United States Court of Appeals, First Circuit.

Heard Nov. 2, 1998.

Decided Jan. 22, 1999.

Raymond L. Sánchez–Maceira, by appointment of the Court, for appellant Eulalio Candelaria–Silva.

G. Richard Strafer, by appointment of the Court, with whom Quiñon & Strafer, P.A., was on brief, for appellant Raúl Ortiz–Miranda.

Enrique Vélez–Rodríguez, by appointment of the Court, for appellant Moisés Candelaria–Silva.

Salvador Pérez–Mayol, by appointment of the Court, for appellant Celenia Reyes–Padilla.

Lydia Lizarribar–Masini, by appointment of the Court, for appellant José Rosado–Rosado.

Rafael Anglada–López, by appointment of the Court, for appellant Nelson Miguel Ortiz–Báez.

Marlene Aponte–Cabrera, by appointment of the Court, for appellant Rosa Morales–Santiago.

Lena D. Watkins, Trial Attorney, Narcotic and Dangerous Drug Section, Criminal Division, U.S. Department of Justice, with whom James K. Robinson, Assistant Attorney General, Criminal Division, U.S. Department of Justice, Theresa M.B. Van Vliet, Chief, Narcotic and Dangerous Drug Section, Criminal Division, U.S. Department of Justice, Robert Lipman and Grace Chung Becker, Trial Attorneys, Narcotic and Dangerous Drug Section, Criminal Division, U.S. Department of Justice, were on brief for appellee.

Before TORRUELLA, Chief Judge, LYNCH and LIPEZ, Circuit Judges.

TORRUELLA, Chief Judge.

Defendant-appellants were charged with conspiracy to possess with intent to distribute and distribution of cocaine base, cocaine, heroin, and marijuana, in violation of 21 U.S.C. §§ 841 & 846. In addition, Count 43 of the indictment charged Nelson Ortiz–Báez ("Ortiz–Báez") with engaging in a monetary transaction in criminally derived property, in violation of 18 U.S.C. § 1957. Count 46 charged Eulalio and Moisés Candelaria–Silva

with possessing cocaine base, cocaine and heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Count 49 alleged the defendants' joint and several liability for forfeiture of $6,000,000, including substitute assets, as authorized by 21 U.S.C. § 853.

The jury returned guilty verdicts as to all of the defendants in this appeal as well as special forfeiture verdicts. The district court sentenced the defendants to the following terms of imprisonment: (1) 480 months for Ortiz–Báez; (2) 540 months for Raúl Ortiz–Miranda ("Ortiz–Miranda"); (3) 210 months for Celenia Reyes–Padilla ("Reyes–Padilla"); (4) 168 months for Rosa Morales–Santiago ("Morales–Santiago"); (5) 660 months for Eulalio Candelaria–Silva; (6) 360 months for Moisés Candelaria–Silva; and (7) 480 months for José Rosado–Rosado ("Rosado–Rosado"). The district court also issued a Final Order of Forfeiture encompassing substitute property of Reyes–Padilla, pursuant to 21 U.S.C. § 853(p).

Defendants base their appeal on numerous evidentiary and procedural grounds. For the following reasons, we **AFFIRM** the judgment of the district court.

## BACKGROUND

The government presented the testimony of three coconspirator witnesses, Marcos Hidalgo–Meléndez ("Hidalgo"), Carlos Otero–Colón ("Otero–Colón"), and Noemí García–Otero ("García–Otero"). Hidalgo pleaded guilty to Count One of the Superseding Indictment. Otero–Colón and García–Otero received immunity from prosecution in exchange for their cooperation. In addition, the government presented the testimony of numerous local police officers who executed search warrants or were otherwise involved in the investigation of the defendants and their co-conspirators. The government also presented documentary and forensic evidence and testimony relating to firearms and drugs seized from the co-conspirators, and other pertinent evidence.

The co-conspirator witnesses testified that Israel Santiago–Lugo ("Santiago–Lugo") operated several drug distribution points ("puntos") at various housing projects in the northern region of Puerto Rico. With the assistance of his co-conspirators, Santiago–Lugo distributed vast quantities of controlled substances including: (1) heroin sold under the name "cristal"; (2) cocaine sold under the names "bolso rojo" and "rolito"; (3) cocaine base; and (4) marijuana.

### A. The Virgilio Dávila Punto

Hidalgo testified that he, Ortiz–Báez, and Wilfredo and David Martínez–Matta began working for Santiago–Lugo's drug distribution ring sometime after Hidalgo moved to the Virgilio Dávila housing project in 1990. He also testified that Ortiz–Báez and others packaged drugs at two rented apartments in Isla Verde and transported the drugs to various puntos. Hidalgo further testified that Reyes–Padilla, Santiago–Lugo's aunt, distributed drugs from a Virgilio Dávila apartment used by Santiago–Lugo's grandparents. From this apartment, Morales–Santiago supplied Santiago–Lugo's distributors with drugs, including heroin and cocaine, and maintained a ledger to account for the drugs and proceeds.

On October 6, 1989, the Police of Puerto Rico ("POPR") executed a search warrant at Virgilio Dávila building 43, apartment 411. Reyes–Padilla was at the apartment with her parents. The search yielded twenty-six grams of cocaine and three grams of heroin packaged in over 250 small bags. Later, on October 17, 1989, the POPR executed a search warrant at the same apartment. When an officer first arrived, a young man was selling a controlled substance through an iron grating on the apartment door. When the officer identified himself, the man fled inside the apartment. A search of the apartment yielded two grams of heroin, less than a gram of cocaine, and over $2000 in U.S. currency.

At trial, POPR officer Angel Nieves–Domínguez testified that, pursuant to a tip, he conducted surveillance of Reyes–Padilla at Virgilio Dávila building 43, apartment 412 during the afternoon of October 1 and the morning of October 2, 1991. On the first day, he observed Reyes–Padilla and Santiago–Lugo retrieve two large bags from the trunk of Santiago–Lugo's car. Upon reaching the stairs to building 43, Santiago–Lugo

opened one of the brown bags and pulled out several transparent plastic bags that each contained smaller red bags. As Santiago–Lugo distributed the plastic bags to the persons assembled, Reyes–Padilla made notations in a notebook. Additionally, upon receiving the packages, some recipients hid the packages in nearby garbage cans or bushes. Reyes–Padilla took the other large brown bag up to apartment 412.

After Santiago–Lugo left, the officer observed one individual—who had received a package from Santiago–Lugo—apparently selling some of the smaller red bags to a young woman near building 44. Shortly thereafter, a young man arrived at apartment 412, and Reyes–Padilla sold the man a transparent bag appearing to contain heroin. The next day, the officer saw Santiago–Lugo arrive and deliver yet another brown bag to Reyes–Padilla.

Later that month, POPR executed a search warrant at apartment 412. At that time, defendants Reyes–Padilla and Morales–Santiago were in the apartment. The search yielded four "decks" of heroin in a Sucrets box, approximately $100,000 in U.S. currency, and two notebooks appearing to contain records of drug deliveries and debts.

In November, POPR officers observed Rosado–Rosado and a minor each engage in an apparent sale of controlled substances and give the proceeds from the sale to a heavy-set individual. Rosado–Rosado retrieved the drugs from a brown paper bag in his back pants pocket. When officers entered the housing project, Rosado–Rosado and the minor attempted to flee. Officers caught Rosado–Rosado and seized eighteen aluminum foil packets containing heroin and five bags containing cocaine.

Hidalgo testified at trial about the importance of the Virgilio Dávila punto as a drug distribution site. He stated that he personally received packages of cocaine and heroin from Morales–Santiago to distribute on behalf of Israel Santiago–Lugo, and that he observed distributors from Santiago–Lugo's other puntos arrive at Virgilio Dávila and receive packages from Morales–Santiago.

He identified four pages of notebook entries under the name "Batman" from the notebook seized in October 1991 that pertained to his distribution of marijuana and cocaine at Virgilio Dávila.

Among the entries in the notebook was one pertaining to fifty packets of heroin, referred to as "C" to correspond to "cristal," and one pertaining to fifty packets of cocaine, referred to as "R" because of the brand name "bolso rojo." Expert testimony showed that the entries recorded transactions transpiring almost daily between October 29, 1990 and October 24, 1991. The notebooks contained a "price structure" table which specified the prices of multiple units with a base price of $75 per unit. A conservative estimate of the amount of drugs distributed would be close to 50,000 units having a total value of approximately $3.5 million dollars.

### B. The Rosario Brothers

In 1993, Hidalgo learned that Santiago–Lugo and the Rosario brothers had become adversaries. Santiago–Lugo and the Rosarios previously had agreed to share control of the drug distribution punto at Virgilio Dávila in Bayamón. According to Hidalgo, the enmity between them stemmed from a drug debt owed to Santiago–Lugo by one of the Rosarios. Tensions escalated in early 1993 when a Santiago debt collector and a Rosario associate were both murdered.

In June 1993, Hidalgo sustained a gunshot wound when an unknown assailant or assailants fired a barrage of bullets from a moving vehicle near Virgilio Dávila. After recuperating, Hidalgo again rejoined the conspiracy. On December 1, 1993, Hidalgo, Ortiz–Báez, Santiago–Lugo, and co-conspirator Andrés Colón–Miranda were arrested in Bayamón. Ortiz–Báez, Hidalgo, and Colón–Miranda were in possession of firearms without proper permits. Hidalgo testified that they were armed due to the ongoing tensions with the Rosario brothers.

### C. The Los Murales Punto [1]

Otero–Colón testified that, sometime in 1988 or 1989, SantiagoLugo's brother Raúl

---

1. "Punto," which is Spanish for "point," is in drug slang a place or location where drugs rou-

and Jorge Martínez–Rosado ("Fobi") reached an agreement with José Román Freites ("Josean") for the distribution of cristal heroin at Los Murales. Otero–Colón, who had served as a lookout for Josean for approximately two months, became a runner who picked up drugs from Virgilio Dávila. He testified that he began picking up fifty packages, each containing ten packets of heroin and costing $70. Eventually, he would pick up as many as 100 packages every three of four days, each costing $75.

Otero–Colón further testified that, after the POPR searched Reyes–Padilla's Virgilio Dávila apartment, the distribution operation was moved to the apartment of Morales–Santiago, who also kept notebooks reflecting drug deliveries and debts. He stated that Ortiz–Báez and others who worked at the "table" in Isla Verde were right-hand men for Santiago–Lugo. These men would sometimes transport drugs to Los Murales when Otero–Colón could not. When Reyes–Padilla was out of heroin, Santiago would direct Otero–Colón to obtain it from another distribution group and keep the profits.

Hidalgo testified that he supervised cocaine and marijuana distribution at the Los Murales housing project in 1991 and 1992, and that during his tenure, all of the drugs distributed there belonged to Santiago–Lugo. He knew Otero–Colón as an individual who would come to the Virgilio Dávila punto to obtain heroin for Santiago–Lugo's punto at Los Murales.

### D. The Villa Evangelina Punto

Otero–Colón identified defendant-appellant Eulalio Candelaria–Silva as "Macho Gatillo," the overseer of the drug point at the Villa Evangelina housing project. Otero–Colón testified that he met the Candelaria–Silvas, including Moisés and Luis, after Josean agreed with Santiago–Lugo to distribute cocaine at Los Murales in exchange for a reduction in the price of heroin distributed there. Otero–Colón stated that he would obtain cocaine from Raúl Santiago–Lugo at Virgilio Dávila and transport the drugs to Eulalio and Moisés' house in Manatí for processing to sell at Los Murales and Villa

Evangelina. Eulalio Candelaria–Silva would pick up the proceeds from Otero–Colón. Moisés assumed Eulalio's role after the latter was incarcerated.

Otero–Colón testified that the Candelaria–Silvas began to distribute "cristal" at Villa Evangelina. On two occasions in 1990, an undercover police officer made controlled purchases of cocaine from Eulalio Candelaria–Silva at Villa Evangelina. In addition, POPR officers executed search warrants at the Candelaria home in 1993 and February 1995. The 1993 search yielded controlled substances including "cristal" heroin.

In addition, the government introduced into evidence a letter that had been seized from the residence of Israel Santiago–Lugo in August 1993. The letter was addressed from "Raúl" to "Macho," and indicated that both of them were in jail at the same time. The letter appeared to discuss price negotiations, and refer to members of the Candelaria family.

### E. The Enrique Catoni Punto

Noemí García–Otero testified that defendant-appellant Rosado–Rosado was introduced to her as "Hormiguita," the supervisor of heroin, cocaine, and marijuana sales at Enrique Catoni. Raúl Santiago–Lugo introduced Ortiz–Báez as "Mickey Mouse." On one occasion, Raul Santiago–Lugo drove Ortiz–Báez to the Ramón–Solá housing project in Arecibo and left him there to supervise. On another occasion, Ortiz–Báez and Rosado–Rosado recruited individuals to distribute drugs at the housing project. In addition, García–Otero identified defendant-appellant Raúl Ortiz–Miranda as someone who would bring drugs to, and pick up money from, the housing project on at least a weekly basis. She testified that she knew Ortiz–Miranda as "Cano Beeper."

### DISCUSSION

### I. Jury Selection

Defendant-appellants argue that the district court violated the Fifth and Sixth Amendments, the Jury Selection and Service

tinely are bought and sold.

Act of 1968 ("the Act"), 28 U.S.C. § 1861, Fed.R.Crim.P. 43(b), and the Amended Plan for the Random Selection of Grand and Petit Jurors for the United States District Court for Puerto Rico ("District Plan") by ex parte eliminating jurors from the venire.

## A. The Jury Selection Act

The Act was enacted to ensure that potential jurors are selected at random from a representative cross-section of the community and that all qualified citizens have an opportunity to be considered for service. *See* H.R.Rep. No. 1076 (1968), 1968 U.S. C.C.A.N. 1792. The Act provides that each district court devise a "local plan" for the selection of jurors consistent with the objectives of randomness and nondiscrimination set forth in §§ 1861 and 1862. *See* § 1863. The local plan for the District of Puerto Rico was devised and approved pursuant to § 1863.

The Act sets forth five specific reasons a summoned juror may be excused by the district court. They are: (1) undue hardship; (2) inability to render impartial service; (3) peremptory challenge; (4) good cause shown; and (5) a determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of the jury deliberations, that the exclusion is warranted, and that the exclusion is not inconsistent with other provisions of the Act. *See* 28 U.S.C. § 1866(c). Section 1866(c) provides that the court may only exclude a person under (5) in open court.

## 1. Jury Orientation

Of eighty prospective jurors in the panel for this case, only sixty-two appeared for jury orientation on the morning of September 13, 1995. At the orientation, conducted on the record but outside the presence of counsel, the district court gave preliminary instructions regarding jury service and distributed the juror questionnaires. He told the jurors nothing specific about the case except the docket number. The judge then instructed the jurors not to discuss the case with anyone, spoke to them about the importance of jury service, and described the ques-

tionnaire. The judge left the courtroom while the jurors viewed the video "Justice by the People" and completed the questionnaires. Upon their completion of the questionnaires, the judge returned and excused the jurors for the day. Because only fifty prospective jurors remained after the morning orientation session on September 13, the court summoned thirteen additional randomly selected prospective jurors from two other panels. These prospective jurors, and one late-arriving member of the original panel, then received substantially the same information and instructions from the judge and completed the questionnaires.

During jury selection the next day, it became clear to Ortiz–Miranda's counsel that some of the juror questionnaires were missing. Upon raising the matter with the district court, the judge explained to counsel that the clerk had "highlighted" certain questionnaires as "problematic," and he had "dealt with those obvious cases." 9/14/95 Tr. at 126. Ortiz–Miranda's counsel objected to the district court's actions on the ground that it "involv[ed] and invok[ed] Fifth and Sixth Amendment rights." *Id.* The court overruled counsel's objections, but agreed to provide counsel with the questionnaire forms and invited counsel to further object after reviewing them if counsel found that the court had "exercised the [sic] improper discretion," *id.*, in excusing fourteen prospective jurors brought to his attention by the jury clerk.

### a. Lack of Qualifications Dismissals

In order to be deemed qualified to serve as a juror on a petit jury in the United States District Court for the District of Puerto Rico, an individual must be a citizen of the United States, eighteen years of age or older, have resided for a period of one year within the judicial district, and be "able to read, write, speak, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the Juror Qualification Form and to render satisfactory jury service in this Court." District Plan at 3.

The district court dismissed six of the prospective jurors based on a lack of proficiency in English. Juror 16 stated that she had

difficulty reading or understanding English and answered the question asking her to describe her work in general terms in Spanish. Juror 17 completed almost all of the questionnaire in Spanish. Juror 18 indicated that she had difficulty with English and also wrote in Spanish that she did not hear well. Juror 45 completed the forms entirely in Spanish. Juror 61 indicated that he had trouble with English and did not give more than a one word response in English to any of the questions requiring more than a yes or no answer. Finally, Juror 93 indicated that he had trouble reading or understanding English, but otherwise completed the questionnaire in English. After examining these questionnaires, we hold that Judge Fusté did not err by dismissing these prospective jurors.

■ The District Plan also mandates that "[n]o person shall be qualified to serve ... if he is incapable, by reason of mental or physical infirmity, to render satisfactory jury service." *Id.* The district court excused two jurors for medical reasons. Juror 13 answered "No" to the question, "Do you have any physical problem (for example, sight, hearing or other medical condition) that would interfere with your ability to serve?" but a note at the bottom of the form states "Eye ongoing medical [illegible]." The government contends that this note was made by the district court, but the author's identity is unclear. The district court did write on the beginning of the form: "See note [page] 3 claimed ongoing eye impediment." Juror 89 stated that he had "Fibrilosis Atrial" and that he was currently taking daily medication. The district court excused him on account of his health and because of his answer to question # 9. Question # 9 asked the degree of education the prospective juror had achieved. Juror 89 had a law degree, but was retired.[2] Although the district court's actions, with respect to these two jurors, were questionable in that Juror 13 did not state that his medical condition would interfere with his serving as a juror and Juror 89 was dismissed in part because he holds a law degree, there was at least some

medical reason why both jurors could have been excused. Accordingly, these excusals were not an abuse of discretion. *See United States v. Contreras*, 108 F.3d 1255, 1269 (10th Cir.1997) (applying abuse of discretion standard to pre voir dire excusals).

### b. Undue Hardship Dismissals

Both § 1866 and the District Plan permit the district court to excuse prospective jurors prior to voir dire on the ground of "undue hardship." Here, the district court excused six jurors on that basis.

■ According to the district court's notes, Juror 3 was excused because he was the only person at his office. Juror 3 stated that he "was the only representative of the company in Puerto Rico. I sell generic medicine to Drug [sic] stores and Hospitals [sic] in P.R[.] My Job [sic] is mostly done by telemarketing for which I can not be away from my work for too long. I m[sic] training a part time employee to assist me due the [sic] increase in sales." The district court excused Juror 32 because she was taking care of her mother, who was in the hospital, and her grandmother, who was at home. Although she was the "only one" who could help them, she stated that she would "be very proud to participate as a juror ... and to let [her] know what [she] should do." According to his notes, Judge Fusté excused Juror 70 because he was a night shift medical technician at Fajardo Hospital.

Jurors 35, 63, and 72 indicated that they had various business and personal travel plans that would conflict with the trial. Juror 35 stated that she would be traveling during the trial to a "Consumers Affairs annual meeting" and then "intend[ed] to take my vacations." Juror 63 was excused by the district court on account of a pre-arranged vacation. During the trial, she was scheduled to attend a training session and to leave with her family on a previously planned vacation. Finally, Juror 72 was excused because he had a reservation to go to Nevada and California for a month during the trial.

---

**2.** We note that under the District Plan, an *actively* practicing attorney may request an exemption from service, but such an exemption is not auto-

matic. *See* District Plan at 5. In any event, such a request would have been improper in this instance because Juror 89 was retired.

The district court did not abuse its discretion in dismissing Jurors 3 and 32, but did impermissibly excuse Jurors 70, 35, 63, and 72. With regard to Jurors 3 and 32, their questionnaires document that acting as Jurors would work an undue hardship. However, the same cannot be said for the others.

With regard to Juror 70, we note that under the District Plan, he could have requested to be excused from jury duty. · The District Plan states that jury service by medical laboratory technicians would entail undue hardship or extreme inconvenience, and such an individual "shall be excused from jury service upon *individual request.*" District Plan at 5 (emphasis added). However, Juror 70 did not request to be excused or object to being a juror. The choice not to serve on the jury at this stage was his and not the court's. The district court acted improperly in unilaterally excusing him from jury service. We cannot be sure whether Juror 70 desired to serve or was unaware of the District Plan's provision. Regardless of his desire or knowledge, however, there was no prima facie reason for him to have been dismissed from the pool at this point.

We begin by noting with respect to Jurors 35, 63, and 72 that the district court incorrectly described their situation to counsel the next morning at jury selection. The district court stated: "What else was there? And people with paid vacations, which they so said in a note, Judge, I'm leaving on such and such a date. How can I detain those people?" 9/14/95 Tr. at 127. After a very close and careful reading of the questionnaires, we did not find any notes on them stating that any of these jurors had paid vacations. If such a statement was made by any of the jurors to the district court, it was not recorded by the Judge on the questionnaires in the record. Jurors 35 "intend[ed]" to take vacations. For Juror 63, "everything was set." Finally, Juror 72 had a "reservation." It appears that the district court interpreted those phrases to mean paid non-refundable, non-changeable tickets although those phrases may well not have meant that at all.

Jury duty works a burden on all called to serve. There are instances in which previously-made travel plans would cause jury service to become an undue hardship. However, the district court all too willingly accepted the proposed excuses of these jurors without· allowing the parties to examine the prospective jurors in voir dire. Exclusions at this stage approach a ministerial function, which is why § 1866 authorizes the clerk of the court under the supervision of the district court—if the District Plan so authorizes—to excuse such jurors. *See* § 1866(c). If jurors are excused as a result of a non-ministerial exercise of discretion better left to voir dire itself, as occurred here, the prospects for the defendant obtaining a fair cross-section of the community could be improperly diminished.

In general, we think it unwise for district judges to engage in ex parte voir dire beyond purely ministerial functions. Ministerial functions permitted by the Plan and Act are usually performed by the clerk, under supervision of the court. If a judge does no more than what a jury clerk is authorized to do in excusing jurors, that may raise an issue of allocation of court resources but does not raise an issue of impropriety. *See United States v. Calaway,* 524 F.2d 609, 616 (9th Cir.1975). When the court, in the absence of counsel, starts questioning jurors and excusing them based on responses which go beyond basic information about qualifications, obvious bias, or hardship, it is all too easy to slip over the line, as happened here. Whether slipping over the line deprives a defendant of statutory or constitutional rights is another question.

## 2. The Remedy

Having established that certain of the exclusions were not justified under the Act, we turn to the question of whether the Act provides appellants with a remedy. By its terms, the Act only provides a remedy—the stay of proceedings pending the selection of a petit jury in conformity with the Act—for substantial failures to comply with its provisions. *See* § 1867(d); *United States v. Calabrese,* 942 F.2d 218, 226 (3d Cir.1991). In order to obtain this remedy, a party chal-

lenging the jury selection process under the Act must make his challenge "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." § 1867(a). The timeliness requirement "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act." *United States v. Paradies*, 98 F.3d 1266, 1277 (11th Cir.1996) (citation omitted). "*[O]nce voir dire begins*, Jury Selection Act *challenges are barred*, even where the grounds for the challenge are discovered only later." *Id.* at 1278 (emphasis added) (citations omitted). The Act requires that any motion filed be accompanied by a "sworn statement of facts which, if true, would constitute a substantial failure to comply with provisions of [the Act]." § 1867(d). When that requirement is not satisfied, the challenge to the selection process must fail, because "Congress left no room for ad ·hoc review of the usefulness of compliance with [the sworn statement] requirement." *Paradies*, 98 F.3d at 1278 (citation omitted).

Ortiz–Miranda's counsel objected after the district court gave counsel the list of the remaining prospective jurors and his instructions for making challenges. She stated the reasons for her objection and the district court took notice. *See* 9/14/95 Tr. at 129. Counsel next asked if the transcript was available. *See id.* The court stated: "The transcript is not available." *Id.* Counsel next asked for a continuance, which was denied. *See id.* But, the district court told counsel that she "can examine the forms" and that there would be "an accounting made by the jury clerk," *id.* at 129–30, but that it would not be done "now," *id.* at 130, because there was "[n]o need to do that now." *Id.*

With a transcript of the above events, it would seem that there would be no quarrel as to what occurred. Unfortunately, that is not the case. In a Memorandum Order dated August 11, 1998, the district court took issue with Ortiz–Miranda's brief, stating: "Contrary to what is stated in the brief on appeal, *counsel* for all defendants, as well as trial attorneys for the Department of Justice, *were given copies of [the original question-*

*naires of those excused] before jury selection commenced in the case now on appeal."* 8/11/98 Memorandum Order at 1 (emphasis added). He continued: "The preparation of the photocopies and sets of documents were turned over to counsel before jury selection was supervised ... and I made certain that all attorneys of record received a set of the pertinent documents so that they could meaningfully participate in the jury selection process." *Id.* at 2. We note that the parties do not agree with the court's assertion that the materials in the case were turned over to them in the above described fashion. Both the defendant-appellants and the government, relying on the transcript of the proceeding and the materials in the record, state that the materials were turned over to the parties after the commencement of voir dire.

Ortiz–Miranda states that the record does not disclose when the questionnaires were actually provided to counsel. The government contends that the record suggests that "the questionnaires were made available sometime after commencement of voir dire, but on September 14, 1995," Government's Resp. to Ortiz–Miranda's Mot. at 3 (based on a memorandum from the district court to the Clerk of the Court and the Jury Administrator dated that day) *or* the questionnaires were "filed under seal in the Clerk's Office on September 19, 1995, the day after the presentation of evidence began." *Id.* (based on Doc. 655 which was signed by Judge Fusté on September 19, 1995).

▮▮▮ Under the Act, the challenge along with the signed affidavit must be filed before the commencement of voir dire. Obviously, this was not possible here because the record establishes that jury selection commenced before counsel had any opportunity to discover that prospective jurors had been excused. In any event, we choose not to wrestle with the thorny question of whether the district court's actions mitigated counsel's duty to comply with the Act. Even if all had proceeded ideally, the district court's erroneous exclusions did *not* constitute a "substantial failure" to comply with the Act. *See* § 1867(d).

▮▮▮ Congress left the content of this term largely up to the courts. *See* 1968 U.S.C.C.A.N. at 1794 ("Your committee

would leave the definition of 'substantial' to the process of judicial decision."). In determining whether a violation is substantial, "the alleged violations must be weighed against the underlying principles of the Act." *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984). These principles are: (1) the random selection of jurors; and (2) the determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. *See id.* The inquiry is as follows:

> For wrongful exclusions, determining whether there has been a substantial violation has both quantitative and qualitative aspects. Quantitatively, a substantial violation generally will not be found if the numbers of errors is small. Qualitatively, the inquiry is whether there has been a frustration of the Act's underlying principle of exclusions on the basis of objective criteria only.

*Calabrese,* 942 F.2d at 227–28 (citation omitted). Here, the number of arguably wrongfully excluded jurors was very small. Further, the Act's principle of exclusions on the basis of objective criteria was not frustrated. In excusing the four individuals, the district court did not engage in qualitatively improper actions such as creating a "new category of exclusions," *see id.* at 228, or discriminating against a class of persons. *See id.* Second, the district court did not prevent the jury panel from consisting of a fair cross-section of the community. *See United States v. Bearden,* 659 F.2d 590, 602 (5th Cir.1981). His actions, though improper, did not constitute a substantial failure to comply with the Act.

**B. Other Claims**

■ Defendant-appellants also argue that their rights under the Fifth Amendment, the Sixth Amendment, and Fed.R.Crim.P. 43 were violated by the district court's ex parte actions. To the extent that the district court improperly dismissed four prospective jurors, we conclude that the errors were harmless to the defendants. *See id.* at 1273 n. 11 (stating that the error must be sufficiently egregious to constitute a constitutional violation).

**II. The Macho Gatillo Alias**

■ Eulalio Candelaria–Silva argues that the district court abused its discretion by refusing to strike his alias, "Macho Gatillo,"[3] from the Superseding Indictment. He contends that the use of the alias was inflammatory, demeaning and prejudicial.

In denying the motion to strike, the district court stated that "Macho Gatillo" served the purpose of a proper name for identification purposes. The record reflects that the POPR officer who conducted two undercover drug purchases from Candelaria–Silva in 1990 knew him only as "Macho Gatillo." In addition, co-conspirator witness Otero–Colón also identified the defendant only by his street name. Furthermore, another POPR officer corroborated these mutually consistent identifications of the defendant by testifying that the defendant was known as "Macho." All of this evidence was probative with respect to identifying Eulalio Candelaria–Silva as the author of the letter seized from Israel Santiago–Lugo's residence—a letter signed "Macho" that discussed the operations of a punto.

It is true that the record reflects the existence of at least one other individual who answered to the name "Macho." For this reason, the POPR undercover officer and Otero–Colón's use of the "Gatillo" portion of the name, which translates as "trigger," was probative to distinguish the defendant.

Eulalio Candelaria–Silva's argument fails because the evidence of his alias was relevant, and there was no prejudice. *See United States v. Delpit,* 94 F.3d 1134, 1146 (8th Cir.1996) (noting that the use of the name "Monster" was necessary to fully identify the defendant); *United States v. Persico,* 621 F.Supp. 842, 860–61 (S.D.N.Y.1985) (stating that aliases and nicknames are proper in an indictment where they will be part of the government's proof at trial).

**III. Co–Conspirator Testimony**

■ Moisés Candelaria–Silva argues that the district court should have excluded the letter seized from the residence of Israel

---

**3.** Roughly translated from Spanish, "Macho Ga- tillo" means "Trigger Man."

Santiago–Lugo. The court admitted this exhibit pursuant to Fed.R.Evid. 801(d)(2)(E) which defines as non-hearsay a statement by a party's co-conspirator made during and in furtherance of the conspiracy. We find Moisés Candelaria–Silva's argument without merit.

The district court conditionally admitted certain evidence pursuant to Fed.R.Evid. 801(d)(2)(E) after making the requisite findings pursuant to *United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.1980). Later, the court expressly found that the letter met the "in furtherance of" requirement of 801(d)(2)(E). At the end of trial, the court made the requisite determination for unconditional admission of the letter and other evidence.

As grounds for exclusion at trial, Moisés Candelaria–Silva argued that there existed a legitimate doubt as to whether Macho Gatillo was a member of this charged conspiracy at the time he wrote the letter. He renews this argument on appeal.

 Letters can fall within the co-conspirator exception to the hearsay rule. *See United States v. Richardson,* 14 F.3d 666, 668–70 (1st Cir.1994). In this case, there is more than sufficient evidence that the statements in the letter were made by a co-conspirator during and in furtherance of the charged conspiracy. First, the seizure of the letter from Israel Santiago–Lugo's residence and references in the letter to the recipient's brother incline toward a finding that the addressee was Israel Santiago–Lugo's brother, Raúl. Furthermore, the writer, "Macho Gatillo"—Eulalio Candelaria–Silva—refers to the involvement of his mother in the transactions discussed. The 1993 seizure of cristal heroin at the Candelaria–Silva residences occurred in the presence of Eulalio Candelaria–Silva's mother and Moisés Candelaria–Silva. In addition, the testimony of Otero–Colón about the Candelaria–Silvas' roles at Villa Evangelina, and the content of the letter, particularly its reference to the specific brand of heroin constitute strong evidence that the letter was prepared by a co-conspirator during and in furtherance of the charged conspiracy. As this Court stated in *United States v. Drougas:*

The source of the placemats [on which a series of handwritten names and numbers appear], the circumstances surrounding their seizure, the fact that the information corresponded to other evidence of the participants in the conspiracy, and the extreme unlikelihood that such a list would be prepared by one not privy to the operation of the conspiracy provide a sufficient basis to infer that the writings pertained to the conspiracy alleged and were made in furtherance of that conspiracy.

748 F.2d 8, 26 (1st Cir.1984).

Here, as in *Drougas,* the extreme unlikelihood that such a letter would be prepared by one not privy to the operation of the "cristal" heroin conspiracy provides a sufficient basis to infer that the letter pertained to the conspiracy alleged and that the statements therein were made in furtherance of that conspiracy. *See Drougas,* 748 F.2d at 26. In light of the overall evidence in the case, the references to the specific brand of heroin and the statements about price and quantity, the district court did not clearly err by admitting the evidence.

## IV. Motion in Limine

### A. Evidence of Prior Dispositions

 Ortiz–Báez, Reyes–Padilla, and Moisés Candelaria–Silva contend that the district court erred in prohibiting them from presenting evidence about the prior dispositions of certain local criminal charges relating to conduct involved in the charged conspiracy. Specifically, the defendants argue that the court's decision prohibited them from presenting a defense. We agree with the district court that the prior dispositions were not admissible.

In deciding this issue, the district court explained that the local prosecutions were not relevant to this prosecution because possible explanations for the early dismissals included "lack of evidence, unavailability of witnesses, sloppy presentation by the state prosecutors, irresponsible legal determinations, and the sort." 9/14/95 Order at 3. Furthermore, the district court rejected the defendants' arguments as "a disguised attempt to argue a double jeopardy defense

before the jury." *Id.* at 4. The district court's order was proper and in accordance with this Court's recent decision in *United States v. Smith,* 145 F.3d 458, 461 (1st Cir. 1998), holding that an acquittal instruction is not required when evidence of acquitted conduct is introduced.

In *Smith,* a defendant, indicted for a drug offense and a tax offense, was acquitted of the drug offense after a trial on that charge alone. During the subsequent trial on the tax offense, the government presented evidence of drug trafficking to demonstrate receipt of income that was not reported to the IRS. On appeal, the defendant argued that the trial court erred in refusing to inform the jury of his acquittal on the drug charge and in barring his cross-examination of prosecution witnesses on their knowledge of that acquittal. The defendant in *Smith,* like the defendants in this case, relied on language in the Supreme Court's decision in *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), to support this position. In *Dowling,* the trial court instructed the jury that the defendant had been acquitted of robbing a witness and the witness's testimony was admitted for a limited purpose. As we noted when rejecting the defendant's argument in *Smith,* however, "the sentence in *Dowling* that begins, 'Especially in light of the limiting instructions' does not identify the language to which 'limiting instruction' refers." *Smith,* 145 F.3d at 461. Furthermore, since an instruction was given in *Dowling,* the Supreme Court did not decide the exclusion issue. *See Smith* 145 F.3d at 461.

The reasons supporting exclusion of evidence about the dismissal of a prior prosecution are even stronger than those that support exclusion with respect to a prior acquittal. As the district court noted, cases are dismissed for many reasons unrelated to the defendant's guilt. The introduction of evidence of a dismissal could well mislead the jury into thinking that a defendant was innocent of the dismissed charge when no such determination has been made.

### B. Certificate of Good Conduct

Moisés Candelaria–Silva argues that, under Fed.R.Evid. 405, the trial court should have admitted a "certificate of good conduct." *See* Defendant's Br. at 23–30. The district court, describing the certificate as a "negative criminal record" certified by the Puerto Rico Police, excluded the document. We hold that the certificate of good conduct is not admissible character evidence.

In *United States v. DeJongh,* 937 F.2d 1 (1st Cir.1991), the district court declined to admit what this Court described as a "Good Conduct Certificate." This Court upheld exclusion on the ground of insufficient authentication.

Furthermore, the certificate of good conduct does not satisfy Fed.R.Evid. 405, which allows proof of character: (1) by "specific instances of conduct," *id.,* on cross-examination or where "character or a trait of character ... is an essential element of a charge, claim, or defense," *id.;* or (2) by "testimony as to reputation or ... in the form of an opinion." *Id.* Here, Candelaria–Silva cannot allege that the proffered certificate of good conduct meets either of these requirements.

### V. Judicial Bias

Defendant Moisés Candelaria–Silva contends that the trial court exhibited judicial bias when it: (1) ruled on numerous evidentiary issues during trial; and (2) chastised counsel in front of the jury. *See* Defendant's Br. at 35–40. On review, this Court considers "isolated incidents in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting." *United States v. Montas,* 41 F.3d 775, 779 (1st Cir. 1994) (internal quotation marks and citations omitted). Furthermore, this Court must "differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality, on the other hand." *Logue v. Dore,* 103 F.3d 1040, 1045 (1st Cir.1997). On several occasions, this Court has held that a trial judge's frustration displayed at sidebar does not deprive a defendant of a fair trial. *See, e.g., United States v. Polito,* 856 F.2d 414, 417–19 (1st Cir.1988) (no bias where, at sidebar, judge warns defense counsel that he is being reported to the State Bar Association for violating rules of

professional conduct); *Deary v. City of Gloucester*, 9 F.3d 191, 194–96 (1st Cir.1993) (no bias where, at sidebar, the trial judge told defense counsel his cross-examination of a witness was "very devious"). Here, Moisés Candelaria–Silva has failed: (1) to demonstrate that the trial court's actions rise to the level of bias; and (2) to meet his burden of demonstrating serious prejudice.

Moisés Candelaria–Silva complains that a number of evidentiary rulings show bias. We have examined those rulings and find they were all proper in the exercise of the court's discretion. Accordingly, Moisés Candelaria–Silva does not demonstrate judicial bias with his complaints concerning: (1) the use of the charts prepared by the government; (2) the display of photographs of firearms, ammunition and drugs to the jury; (3) the admission of testimony of an expert witness to explain the drug ledgers; (4) the exclusion of evidence of prior acquittals; (5) the exclusion of defense impeachment evidence concerning past instances of untruthfulness; (6) the exclusion of a utility bill to establish Moisés Candelaria–Silva's place of residence as different from his mother's house; (7) the district court's application of Fed.R.Evid. 801(d)(2)(E); (8) its admission of evidence of allegedly unrelated murders and misconduct by defendants; or (9) its alleged approval of the government's use of leading questions.

Similarly, Moisés Candelaria–Silva's complaint about the trial court's "facial expressions," Defendant's Br. at 37, falls short of the mark. The transcript indicates that after an extensive discussion among all defense counsel, at least two defense counsel indicated that the district judge did not cover his mouth or make faces when weapons were introduced into evidence. *See* 10/27/95 Tr. at 1861. Perhaps one defense counsel accurately summed up the situation when he remarked: "I would also say for the record, I have been able to perceive a very high tension among all counsel. And that every small incident, in my opinion, is blown out of proportion." *Id.* at 1883–84.

Assuming *arguendo* that the trial court exhibited frustration from time to time during this rather lengthy, heated trial, the strong instructions given by the trial court during and at the end of the trial should have eliminated any conceivable prejudice. For example, shortly after the bench conference regarding facial expressions, the district court instructed the jury:

> Remember also what I told you at the beginning, when we started the first day when I impaneled you. Nothing that the court may say or do during the course of this trial is intended to indicate nor should be taken by you as indicating what your verdict should be. Also, as you have perceived, throughout this trial, trial practice is very demanding of judges and attorneys and sometimes there exists at a given trial colloquy between the court and counsel. This colloquy sometimes is easy going and sometimes I, as a judge, have to take a stand to keep proceedings returning in an orderly way. It is very important for all of you to understand that any colloquy between court and counsel is not to be considered by you in determining the issues of this case.

*Id.* at 1995. Such jury instructions are an appropriate means to "allay[ ] potential prejudice." *Logue*, 103 F.3d at 1046–47 (citation omitted).

Thus, Moisés Candelaria–Silva has failed to meet his burden of showing serious prejudice.

## VI. Rule 16

Ortiz–Miranda argues that the district court should have suppressed García–Otero's identification testimony as the fruit of a Rule 16 discovery violation. Although Ortiz–Miranda argued for suppression of the identification on the merits in the district court, *see* 11/16/95 Tr. at 3449–52, 3479–82, he never sought suppression as a discovery sanction. Therefore, this argument is waived. *See United States v. Barnett*, 989 F.2d 546, 554 (1st Cir.1993) ("Issues not squarely raised in the district court will not be entertained on appeal.").

## VII. Jury Instructions

Ortiz–Miranda argues that the evidence at trial mandated an instruction ex-

plaining the particular concerns attendant to eyewitness identification and explicitly stating that a guilty verdict required a finding of identity beyond a reasonable doubt. *See* Defendant's Br. at 46. However, we have expressly "declined to adopt ... a rule of *per se* reversal [for such an error], choosing not to constrain district courts with yet another mandatory requirement." *United States v. Angiulo,* 897 F.2d 1169, 1206 n. 20 (1st Cir.) (citing *United States v. Kavanagh,* 572 F.2d 9, 13 (1st Cir.1978)), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

■ Contrary to Ortiz Miranda's assertion, he was not entitled to a particular instruction on the facts of this case. As this Court further stated in *Angiulo:*

> [T]he refusal to give a particular requested instruction, however, is reversible error only if the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.

897 F.2d at 1205 (internal quotation marks and citations omitted).

Here, Ortiz–Miranda has not satisfied the second and third prongs of the *Angiulo* test. First, the district court's charge substantially covered the identification issue:

> Let's now discuss the subject of how is it that you gauge or assess the credibility of witnesses.... In making that decision, you may take into account a number of factors, including the following:
>
> One, was the witness able to see or hear or know the things about which that witness testified?
>
> Two, *what kind of opportunity did the witness have to observe facts or identify people, including the accused?*
>
> Three, how well was the witness able to recall and describe those things or persons observed?
>
> Four, *how positive was the witness' recollection of facts and the identification of people, including those accused?*

> Five, what was the witness' manner while testifying? By "manner," I mean appearance, demeanor.
>
> Six, ... *was the witness ever confused as to facts or the identification of persons, or did he or she misidentify or fail to identify a person or the accused on prior occasions?*

12/1/95 Tr. at 4554–55 (emphasis added).

Second, García–Otero testified twice at trial, and thus Ortiz–Miranda had ample opportunity to develop the identification defense during cross-examination, the presentation of defense evidence, and closing argument. Since the court's jury instructions addressed the identification issue three times, Ortiz–Miranda's "ability to effectively present" the identification defense was not "seriously impaired." *Angiulo* 897 F.2d at 1205–06.

## VIII. Failure to Disclose and Newly–Discovered Evidence

■ Ortiz–Miranda argues that the government's failure to disclose during trial its knowledge of Rivera–Meléndez's whereabouts, his possession of a green motorcycle, his involvement in certain criminal activity, and his association with the alias "Cano Beeper" in POPR records, constituted a due process violation warranting reversal pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Ortiz–Miranda also argues that newly discovered evidence from a witness who began cooperating after conclusion of the trial independently and cumulatively mandates a new trial. Ortiz–Miranda's claims fail because, as the district court correctly concluded, there is no "reasonable probability" that disclosure of the *Brady* material during trial would have resulted in Ortiz–Miranda's acquittal. *See Gilday v. Callahan,* 59 F.3d 257, 267 (1st Cir.1995), *cert. denied,* 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996). Nor, as the district court concluded, does the combination of the *Brady* material and newly-discovered evidence create such a "reasonable probability."

Ortiz–Miranda's motion for a new trial does not specifically cite the failure to disclose Rivera–Meléndez's location as grounds

for relief. Rather, his counsel placed this information in an "Affirmation" appended to the motion. Thus, although the district court heard evidence on this issue at the hearing, it did not specifically consider it in the *Brady* analysis. The draft search warrant affidavit did not contain information about the sighting of Rivera–Meléndez because that event did not occur until after the prosecutor had declined to authorize Rivera–Meléndez's arrest. In its analysis of the draft affidavit, however, the district court assumed the availability of Rivera–Meléndez and determined that such availability would not have created a reasonable probability of Ortiz–Miranda's acquittal. First, the court found it improbable that Rivera–Meléndez would exculpate Ortiz–Miranda by implicating himself. *See United States v. Ortiz–Miranda,* 931 F.Supp. 85, 93 (D.P.R.1996). Furthermore, the court found it improbable that García–Otero would recant her identification of Ortiz–Miranda or her failure to identify Rivera–Meléndez even if the defense produced Rivera–Meléndez. *See id.*

Ortiz–Miranda does not elaborate on how Rivera–Meléndez's "very presence in court," Defendant's Br. at 35–36, would otherwise have created a reasonable probability of acquittal. Such a claim is especially questionable because the jury already had the benefit of comparing photographs of the two men when assessing the accuracy of García–Otero's identification of Ortiz–Miranda. The government, while conceding the possibility that Rivera–Meléndez could also be involved with Israel Santiago–Lugo's organization, reasonably argued in closing arguments that the testimony of García–Otero and other evidence nonetheless established the guilt of Ortiz–Miranda.

With respect to the draft probable cause affidavit itself, the district court determined that it "favor[ed]" the misidentification claim insofar as it did not contradict the Department of Transportation information about the green motorcycle and suggested Rivera–Meléndez's involvement in drug trafficking. It did not, however, exculpate Ortiz–Miranda. *See Ortiz–Miranda,* 931 F.Supp. at 92–93. Similarly, the district court correctly recognized that although the missing page of the

criminal history report would have "favored" the defense by attributing the alias "Cano Beeper" solely to Rivera–Meléndez, the government perhaps could have established that the POPR database was incomplete. *See id.* at 93.

As the district court recognized, it is the "reasonable probability" standard that distinguishes merely "favorable" evidence from "material" evidence, the intentional or unintentional withholding of which violates a defendant's due process rights. *See Gilday,* 59 F.3d at 267. On this record, we agree with the district court that "the sum of evidence withheld is hardly of the variety that would undermine our confidence in the outcome of the trial." *Ortiz–Miranda,* 931 F.Supp. at 94.

Finally, Ortiz–Miranda summarily asserts "prosecutorial misconduct" as grounds for reversal. In view of the fact that he neither develops this argument nor cites any supporting authority, we reject this argument out of hand. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) ("[A] litigant has an obligation to spell out its arguments squarely or distinctly, or else forever hold its peace.").

## IX. Sufficiency of the Evidence

First, with respect to Count 46, conspiracy to possess cocaine and other controlled substances with the intent to distribute, Moisés Candelaria–Silva argues that the evidence was insufficient because the POPR investigation that led to the seizure did not link him to the Sabana Seca residence where the seizure occurred. This claim fails because to obtain a conviction, the investigative officers need not identify all the perpetrators prior to arrest. Here, the testimony of Otero–Colón about the Candelaria–Silva family's use of the Sabana Seca residences to process cocaine and other drugs for distribution well supported the jury's verdict as to his involvement in the conduct charged in Count 46.

Second, Rosado–Rosado and Moisés Candelaria–Silva argue that the evidence established the existence of separate conspiracies. We find their argument to be without merit.

■ The evidence presented at trial established that there was an overarching conspiracy headed by Israel Santiago–Lugo to distribute controlled substances, including heroin, cocaine, and marijuana. The drugs were distributed at various places and by various people, including members of the Candelaria family. As noted in *United States v. Wihbey*, "[t]he question whether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency." 75 F.3d 761, 774 (1st Cir.1996) (citing *United States v. David*, 940 F.2d 722, 732 (1st Cir.), *cert. denied*, 502 U.S. 989, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991)).

■ Here the trial court expressly charged the jury on the multiple conspiracy defense:

> You must decide whether the conspiracy charged in the indictment existed and, if it did, who at least some of its members were. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

12/1/95 Tr. at 4569–70. Thus, the jury verdict can be viewed as a rejection of the multiple conspiracy claim. *Wihbey*, 75 F.3d at 775 n. 8 (stating that when the district court gives a multiple conspiracy instruction, a guilty verdict "can be seen as an effective rejection of the multiple conspiracy theory").

As noted in *United States v. Twitty*, 72 F.3d 228 (1st Cir.1995), the arguments made by the defendant-appellants are not uncommon:

> Twitty's argument is a common one in conspiracy appeals. Whenever a conspiracy involves successive transactions and multiple players, it is usually possible to slice the enterprise into discrete portions. Even a single conspiracy is likely to involve subsidiary agreements relating to different individuals and transactions. And more often than not, none of the agreements is explicit; agreement is inferred from conduct; and the conceptual tests used to distinguish between one conspiracy and many are not sharp edged. *See, e.g., United States v. Drougas*, 748 F.2d 8, 17 (1st Cir.1984).

*Id.* at 231 (emphasis supplied).

■ In *Wihbey*, this Court, quoting *United States v. Glenn*, 828 F.2d 855, 858 (1st Cir.1987), set forth the framework for analyzing a claim that the evidence was insufficient to allow the jury to find a single conspiracy and that, instead, the evidence showed two separate conspiracies:

> (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so [i.e., the answer to (2) is yes], does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error?"

75 F.3d at 773. "Put differently, so long as the statutory violation remains the same, the jury can convict even if the facts are somewhat different than charged—so long as the difference does not cause unfair prejudice." *Id.* (internal quotation marks and citation omitted).

Analyzing this case under the first prong of the *Glenn* test, the evidence is clearly sufficient to permit a jury to find that appellants Rosado–Rosado and Moisés Candelaria–Silva joined the overarching conspiracy charged in Count I. Assuming arguendo, as in *Wihbey*, that there was insufficient proof that appellants Rosado–Rosado and Moisés Candelaria–Silva were members of the overarching conspiracy alleged in Count I, still, the second prong of the *Glenn* test would be answered in the affirmative. For example, Moisés Candelaria–Silva largely concedes that the evidence was sufficient to convict him of the statutory offense charged in Count I—engaging in a conspiracy in viola-

tion of 21 U.S.C. 846. Likewise, appellant Rosado–Rosado states: "It is the contention of . . . appellant that the overt acts for which evidence was presented against him relate— if at all [—] to separate and distinct drug operation or conspiracy." Defendant's Br. at 8. Regardless of this assertion, however, both Otero–Colón and García–Otero testified as to their involvement in a conspiracy with him.

Since the second prong of the *Glenn* test is answered in the affirmative, to obtain a reversal, appellants must meet their burden under the third prong of the *Glenn* test— that as a result of the variance, they were unfairly prejudiced. *See Wihbey*, 75 F.3d at 773. In *Wihbey*, the Court noted that there were at least three ways in which such a variance might prejudice the accused. First, a defendant may receive inadequate notice of the charge against him and thus is taken by surprise at trial. Second, a defendant may be twice subject to prosecution for the same offense. Third, a defendant may be prejudiced by "evidentiary spillover"—the "transference of guilt" to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved. *See id.* at 774.

Like the appellants in *Wihbey*, the appellants here have failed to carry their burden of establishing unfair prejudice. Appellants have clearly failed to establish the applicable test with respect to a claim of prejudicial spillover—"prejudice so pervasive that a miscarriage of justice looms." *Id.* at 776 (internal quotation marks and citation omitted). Here, the jury clearly assessed the evidence against each defendant separately. This is demonstrated by the fact that the jury declined to reach any verdict as to defendant Andrades–Marrero. *See* 12/13/95 Tr. at 5093. Thus, appellants have not established unfair prejudice.

Accordingly, defendant-appellant's "multiple conspiracy" argument is rejected.

## X. Factual Findings at Sentencing

### A. Ortiz–Miranda

■ In challenging his sentence, Ortiz–Miranda argues that the district court erro-

neously attributed 1.5 kilograms of cocaine base to him based upon extrapolating from an "average" dosage amount. Upon review, we conclude that the record supports the district court's determination.

The district court properly considered testimony concerning at least ten total cocaine base deliveries directly involving Ortiz–Miranda at the puntos in Arecibo and Vega Baja. This estimate was based upon the trial testimony of García–Otero and testimony at the hearing on the motion for a new trial. In addition, Ortiz–Miranda had been arrested at the Arecibo location with approximately 596 capsules of cocaine base in July 1994, and Ortiz–Báez had been arrested near there in 1995 with over 1200 capsules containing a total amount of 196 grams of cocaine base.

García–Otero testified that at least 500 capsules of cocaine base were distributed on a weekly basis in Vega Baja, and that Ortiz–Miranda made approximately six deliveries. Thus, a conservative estimate of Ortiz–Miranda's direct involvement with 6,000 capsules at the two locations would yield one kilogram of cocaine base and a higher weight of the total mixture containing it, the capsules. *See* USCG § 2D1.1(c)*(A) ("weight of a controlled substance . . . refers to the weight of any mixture or substance containing [it]"). In addition, the district court could reasonably infer that the additional deliveries of at least 3,000 capsules, yielding approximately another one-half kilogram of cocaine base to the Arecibo location would have been reasonably foreseeable to Ortiz–Miranda as part of the conspiracy. Here, even using a conservative estimate, the district court properly attributed 1.5 kilograms of cocaine base to Ortiz–Miranda.

### B. Eulalio Candelaria–Silva

■ Eulalio Candelaria–Silva argues that, because the firearms seized from the Sabana Seca buildings were "out of reach," not used, and not definitively linked to him, the district court erred in imposing the two-level increase to his guidelines offense level pursuant to USCG § 2D1.1(b)(1). However, at sentencing, Candelaria failed to challenge the link between himself and the firearms. As a result, we reject his claim. *See Barnett,*

989 F.2d at 554 ("raise-or-waive" rule not relaxed where evidence supports sentencing findings).

At sentencing, the district court correctly rejected Candelaria's claim that a relationship between the drugs and the firearms was "clearly improbable." 4/19/96 Tr. at 12. Specifically, the district court determined that "in the context of the evidence ... there [was] no doubt ... that the weapons ... had a definite, clear connection with drug trafficking." *Id.* at 13–14. The court stated further:

> [T]hese were not hunting weapons. These were not a collection of weapons. This was not a weapon had, like many people do, to just defend their home in the event some burglar comes in ... These were loaded AK–47s and Ar–15s, we're talking about assault rifles.

*Id.* After reviewing the record, we uphold the district court's determination.

### C. Ortiz–Báez

At sentencing, Ortiz–Báez acknowledged his involvement as a core member of the conspiracy. Specifically, he acknowledged working at the "table" in Isla Verde and going "out hunting for people to kill them [during the drug war with the Rosarios]." Defendant's App. at 58. In fact, his candor so impressed the judge that the judge adjusted his offense level for acceptance of responsibility. *See* Ortiz–Báez Sentencing Findings at 2.

Ortiz–Báez now maintains, however, that the sentence imposed was "exaggeratedly harsh," and alleges that the government was retaliatory in seeking a three-level, as opposed to two-level, adjustment, pursuant to USCG § 3B1.1(b), for his role in the offense. Contrary to his assertions, however, the record reflects that, because Ortiz–Báez's relevant conduct clearly involved five or more participants, he is not eligible for the mere two-level adjustment pursuant to USCG § 3B1.1(c). Thus, the district court did not clearly err.

### D. Reyes–Padilla and Morales–Santiago

Reyes–Padilla argues that the district court should have imposed a lower sentence because of her age, medical condition and rehabilitative efforts. *See* Defendant's Br. at 10–11. At sentencing, however, she raised none of these claims, preferring instead to argue that she had withdrawn from the conspiracy after the 1989 execution of search warrants at her Virgilio Dávila apartment. *See* Defendant's App. at 66–79. Notwithstanding this waiver, age and health are not ordinarily relevant sentencing factors, *see* USCG §§ 5H1.1 & 5H1.4, and Reyes–Padilla makes no argument that age and health in this case constitute a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." USCG § 5K2.0. Furthermore, her rehabilitation claim is belied by the fact that, at sentencing, she refused to acknowledge participation in the conspiracy after 1989. *See* Defendant's App. at 71. The record supports the sentence imposed.

Morales–Santiago also argues that the district court erred in determining her relevant conduct, pursuant to USCG § 2D1.1, and in denying her an adjustment for acceptance of responsibility, pursuant to USCG § 3E1.1. *See* Defendant's Br. at 7–8. Although Morales–Santiago has provided no transcript of the sentencing proceedings, the available record supports the district court's determination. The record reflects that, during at least part of the conspiracy, Morales–Santiago was charged with storing large quantities of controlled substances, directly providing Israel Santiago's distributors with those controlled substances, collecting proceeds, and maintaining accounting records. As such, the expansiveness of the distribution conspiracy was reasonably foreseeable to her even though she may not have participated in every transaction. Furthermore, contrary to Morales–Santiago's assertions, the Presentence Report ("PSR") at 30–31 does reflect a "thorough explanation of her participation in the case at hand" when viewed in the context of the trial testimony of Hidalgo

and Otero–Colón. Thus, Morales–Santiago's claim has no merit.

## XI. Forfeiture of the Montañez Property

Reyes–Padilla makes six separate objections to the inclusion of the Montañez Property in the Final Order of Forfeiture: (1) that there was no evidence that the property was traceable to drug proceeds; (2) that she was denied the opportunity to have the forfeiture determined by a jury; (3) that there was no principal asset for which the Montañez property could properly be substituted; (4) that forfeiture of the property constitutes double jeopardy; (5) that the government waived its right to forfeit the property as a substitute asset when it withdrew it from Count 49; and (6) that her joint and several liability for the full amount realized by the conspiracy violates the Excessive Fines Clause of the Eighth Amendment. None of Reyes–Padilla's arguments is compelling.

### A. Forfeiture of a Substitute Asset

 A criminal forfeiture order may take several forms. First, the government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense. Second, to the extent the government can trace any of the proceeds to specific assets, it may seek the forfeiture of those assets directly pursuant to 21 U.S.C. § 853(a)(1). Third, if as a result of some act or omission of the defendant, the government cannot trace the proceeds to specific assets, it may seek the forfeiture of "any property, cash or merchandise, in satisfaction of the amount of criminal forfeiture to which it is entitled." *United States v. Voigt*, 89 F.3d 1050, 1088 (3d Cir.1996); *see* 21 U.S.C. § 853(p) (authorizing forfeiture of substitute assets).

In *Voigt*, the Third Circuit held that a defendant convicted of laundering $1.6 million was required to forfeit that amount as a money judgment. *See* 89 F.3d at 1084. When the government could not directly trace any forfeitable proceeds to the defendant's current assets, the court held that the government could satisfy the $1.6 million judgment by seeking forfeiture of the defen-

dant's assets as substitute assets. *See id.* at 1088.

 Similarly, in this case, the district court ordered forfeiture of the Montañez property as a substitute asset to satisfy, at least in part, the $6,000,000 money judgment set forth in the preliminary order of forfeiture because the government established that it could not trace any of the criminal proceeds into any of the defendant's current assets.

In this context, failure to establish any nexus between the MONTAÑEZ property and the conspiracy is irrelevant. In fact, such a nexus would render forfeiture of the property as a substitute asset unnecessary. *See Voigt*, 89 F.3d at 1086 ("[t]he substitute asset provision comes into play only when forfeitable property cannot be identified as directly 'involved in' or 'traceable to' [the criminal activity]").

To obtain an order forfeiting property as a substitute asset, the government need only comply with the requirements of § 853(p). In particular, substitute assets may be forfeited if the government shows that, as a result of any act or omission of the defendant, the forfeitable property "(1) cannot be located upon the exercise of due diligence; [or] (2) has been transferred or sold to, or deposited with, a third party." § 853(p)(1) & (2).

Here, the government complied with § 853(p) by submitting a motion and affidavit that recited the efforts the government had made to locate the proceeds of the drug conspiracy that would have been directly forfeitable under § 853(a). *See* Defendant's App. at 121–24 (Affidavit of Special Agent Felicia Ramos–Andino). The affidavit concluded that Reyes–Padilla had "dissipated or otherwise disposed of the proceeds of her drug trafficking," *id.* at 123, so that the proceeds could not, despite the exercise of due diligence, be located. *See id.* at 123–24. Based on this record, it was not error for the district court to order the forfeiture of "other property of the defendant," § 853(p), up to the amount described in the money judgment. *See* § 853(p); *United States v. Hurley*, 63 F.3d 1, 23–24 (1st Cir.1995) (affirming

forfeiture of substitute assets under identical provision in 18 U.S.C. § 1963(m)).

## B. Determination of Assets

Reyes–Padilla contends that she was denied the right to have the jury determine whether the Montañez Property could be forfeited. She also asserts that there was no "principal asset" for which the Montañez Property could properly be substituted.

▮ The forfeiture of substitute assets is a matter left solely to the court. *See Hurley*, 63 F.3d at 23 ("the statute says that an order substituting assets is to be made by 'the court' "). As this Court explained in *Hurley*, the defendant has a right to have the amount subject to forfeiture determined, in the first instance, by the jury. *See* 63 F.3d at 23; *see also* Fed.R.Crim.P. 31(e) (stating that the initial forfeiture is sought in the indictment and is specified in a special verdict). But the jury has no role in determining, subsequently, whether the property has been dissipated and whether the government is thereby entitled to seek the forfeiture of substitute assets. "Indeed, the government might not even know that substitution is necessary until it seeks to take possession of the property specified in the initial forfeiture order." *Hurley*, 63 F.3d at 23.

▮ In this case, the jury determined— by rendering the special verdict—that the conspiracy realized $6,000,000 in proceeds from the commission of the specified offenses, and that the defendant and others were jointly and severally liable for that amount. Thus, the jury determined that the $6,000,000 was the "principal asset" subject to forfeiture. In having the jury determine that amount, the defendant was afforded all of the procedural protections regarding the determination of the forfeiture by the jury to which she was entitled.

## C. Double Jeopardy and Waiver

▮ There is no merit whatsoever in Reyes–Padilla's contention that she was subject to double jeopardy because the government commenced its case with a civil seizure, but concluded it by proceeding under the substitute assets provision of the criminal forfeiture statute. Nor did the government's initial inclusion, and subsequent dismissal, of the Montañez property from Counts 48 and 49 of the Superseding Indictment constitute a waiver of the right to seek forfeiture of the property as a substitute asset.

▮ A completed civil forfeiture of property does not constitute "jeopardy" under the Double Jeopardy Clause, and does not bar the subsequent criminal prosecution and punishment of the defendant whose property was forfeited. *See United States v. Ursery*, 518 U.S. 267, 274, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (stating that the Supreme Court has consistently concluded that "the Clause does not apply to [civil forfeitures] because they do not impose punishment"). *A fortiori*, a civil forfeiture action that goes no further than a seizure, and never results in the entry of any civil forfeiture judgment cannot constitute jeopardy. Moreover, this Court has recognized that it is "perfectly proper" to begin a forfeiture action with a civil seizure, and then to convert the action to a criminal forfeiture once an indictment is returned. *See United States v. Kingsley*, 851 F.2d 16, 18 & n. 1 (1st Cir.1988). Indeed, that procedure is commonplace.

▮ Nor is it uncommon for the government to shift theories of criminal forfeiture— from direct forfeiture to substitute assets— upon return of an indictment. We held in *Voigt* that when the government's attempt to forfeit the defendant's property directly was unsuccessful, the remedy was for the government to seek forfeiture of the same property as a substitute asset under § 853(p). *See Voigt*, 89 F.3d at 1088. If, as *Voigt* illustrates, it is proper to seek the forfeiture of property as a substitute asset even after a jury has rejected the government's attempt to forfeit the property directly, then there is no error in allowing the government to dismiss the property from the forfeiture allegation before it goes to the jury and to seek the forfeiture as a substitute asset after trial. In dismissing the Montañez property from the forfeiture allegation in Count 49, the government simply shifted its theory of forfeiture from § 853(a) to § 853(p). Doing so before submission of the case to the jury was entirely proper in light of the prosecutor's conclu-

sion that there was insufficient evidence to support direct forfeiture under § 853(a).

### D. Excessive Fines Clause

 It is well-established that criminal defendants are jointly and severally liable for forfeiture of the full amount of the proceeds of their criminal offense, and that the imposition of such a forfeiture judgment does not constitute an unconstitutionally excessive fine. *See Hurley,* 63 F.3d at 23 ("the government can collect [the amount subject to forfeiture] only once but, subject to that cap, it can collect from any appellant so much of that amount as was foreseeable to that appellant"); *see also United States v. Simmons,* 154 F.3d 765, 769–70 (8th Cir.1998) (holding that each defendant is jointly and severally liable for all foreseeable proceeds of the scheme and that "the government is not required to prove the specific portion of proceeds for which each defendant is responsible").

In *Hurley,* we affirmed precisely the action taken here: the imposition of an order substituting other property of each defendant up to the value of the criminal proceeds for which the defendant was jointly and severally liable. In that case, each of the defendants, including the relatively minor participants, was ordered to forfeit substitute assets up to approximately $140 million in value. If holding each defendant jointly and severally liable to forfeit that amount in substitute assets did not violate the Excessive Fines Clause, then the forfeiture imposed on Reyes–Padilla does not.

It is true, as Reyes–Padilla notes, that the Eighth Circuit has held that holding a "secondary figure" jointly and severally liable for the forfeiture of the full amount of the criminal proceeds may constitute an excessive fine if the defendant "reaped little benefit" from the scheme. *See United States v. Van Brocklin,* 115 F.3d 587, 602 (8th Cir.1997). *Van Brocklin* does not aid the defendant.

First, in *Hurley,* we upheld the imposition of a substitute assets order for the full amount of the criminal proceeds against relatively low-level participants who reaped little personal benefit from the criminal offense.

Second, in its most recent opinion on the matter, the Eighth Circuit relied on *Hurley* to uphold a forfeiture order holding the defendants jointly and severally liable for the full amount of the proceeds of a bribery offense, whether or not a given defendant received those funds personally. *See Simmons,* 154 F.3d at 769.

Third, it is appropriate to hold Reyes–Padilla accountable. Although the district court determined that she was a minor participant in the offense, she served as an important link between Israel Santiago–Lugo and his distributors at the various housing projects. Because she personally received and stored controlled substances at her apartment and at the apartment of Morales–Santiago, personally provided wholesale quantities of controlled substances to Santiago–Lugo's distributors, and also assisted with maintaining records of these transactions, she is appropriately characterized as being "in charge of Santiago Lugo's drug trafficking business at the Virgilio Dávila Housing Project in Bayamón." Defendant's App. at 121 (Affidavit of Special Agent Felicia Ramos–Andino). Reyes–Padilla was at Morales–Santiago's apartment when POPR officers seized approximately $96,000 in currency and the drug ledgers reflecting over $3,000,000 worth of transactions during a one-year period. Given Reyes–Padilla's role, holding her liable for the full amount of the proceeds of the conspiracy falls well within the bounds we prescribed in *Hurley.*

Finally, Reyes–Padilla does not challenge the $6,000,000 money judgment. Rather, her appeal challenges only the forfeiture of the Montañez property as a substitute asset. The Montañez property has a value of only $169,000. Reyes–Padilla cannot seriously argue that the forfeiture of property valued at that amount is "grossly disproportional" to the gravity of a drug conspiracy that realized millions of dollars in proceeds. *See United States v. Bajakajian,* 524 U.S. 321, ——, 118 S.Ct. 2028, 2036, 141 L.Ed.2d 314 (1998) (holding that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense"). Accordingly, the forfeiture of Reyes–Padilla's Montañez property does

not violate the Excessive Fines Clause of the United States Constitution.

## CONCLUSION

For the reasons stated in this opinion, we **AFFIRM.**