# United States Court of Appeals
## For the First Circuit

No. 05-1428

UNITED STATES OF AMERICA,

Appellee,

v.

OMAR RODRÍGUEZ-RIVERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Circuit Judge,
Baldock*, Senior Circuit Judge, and
Howard, Circuit Judge

Jorge L. Armentos-Chervoni, for appellant.
Thomas F. Klumper, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Appellate Chief, were on brief for appellee.

January 10, 2007

* Of the Tenth Circuit, sitting by designation.

**HOWARD**, <u>Circuit Judge</u>.  Omar Rodríguez-Rivera appeals his conviction and sentence for his role in two robberies interfering with interstate commerce in violation of 18 U.S.C. § 1951(a).  We affirm.

I.

Rodríguez was charged with participating in two separate conspiracies to commit robbery.  His indictment alleged that he and two cohorts, Elin Lugo-Echevarria and Samuel Santos-Ortiz, conspired to rob, first, a bar and check-cashing business in Guayamo, Puerto Rico, and, second, a beer truck en route from San Juan, in the spring and summer of 2001.  To provide the necessary context for Rodríguez's claims, we briefly survey the evidence adduced at trial.

In 2001, Rodríguez worked in Guayamo, at a bakery across the street from a bar and check-cashing business owned and operated by Juan Narbel Rivera-Vázquez.  From the bakery, Rodríguez had occasion to observe Narbel arrive at his business every Thursday morning carrying a satchel of money.  Rodríguez approached Lugo and Santos, two of his long-time friends, about taking advantage of this opportunity to rob Narbel.  Rodríguez offered to provide a 9 mm pistol for use in the crime.

On the day of the robbery, Santos and Lugo drove together to the neighborhood where the bakery and check-cashing business were located.  Santos was armed with the pistol Rodríguez had given

-2-

him.  Based on instructions from Rodríguez, Santos waited in the vehicle until Narbel arrived.  Santos then entered the business and, in the course of wrestling the satchel away from Narbel, shot him several times.  Santos and Lugo fled the scene in their car. Narbel died from his wounds.

Santos and Lugo met Rodríguez at his home later that day, where Santos returned the pistol to Rodríguez.  Santos also gave Rodríguez between $2,000 and $2,500 from the approximately $10,000 in proceeds from the robbery.  A few days later, Rodríguez asked Santos and Lugo for additional money to buy the silence of one of Rodríguez's co-workers at the bakery, Raul Rodríguez-Torres, whom Rodríguez had told of the plan to rob Narbel before it had been carried out and with whom he had discussed the crime afterwards. Santos and Lugo together gave Rodríguez $600 for this purpose, half of which he paid to Rodríguez-Torres.

Santos and Lugo saw each other often in the months following the robbery.  On the morning of July 11, 2001, Santos called Lugo and asked him to go out with him for the day.  Santos then arrived at Lugo's house, driving a minivan with a 9 mm pistol on one of the seats.  Santos told Lugo that Rodríguez was the source of the gun--the same one, in fact, used in robbing Narbel. Santos also told Lugo that they were driving to San Juan that day to steal a truckload of beer, which Santos planned to sell for $30,000.  Lugo dropped Santos off on the side of the expressway

near Salinas, Puerto Rico, to wait for the beer truck to pass. Santos flagged down the truck while Lugo continued ahead in the minivan, exited the expressway, and parked at a roadside stand.

Lugo then followed the truck, now under Santos's control, to a vacant lot off the expressway, where the vehicles were joined by another minivan occupied by two men who had arranged to buy the stolen beer, known to Lugo as "Ricky" and "Colon." The trailer of beer was detached from the truck and left with Ricky and Colon, while Lugo followed Santos, still driving the truck, to a spot on the side of the road in Aguirre, Puerto Rico. There, Santos shot and killed the truck driver, José Vázquez-Feliciano, and abandoned the vehicle. Later that day, Santos and Lugo went to Salinas to meet Ricky, who paid Santos $15,000 for the beer. Rodríguez received $2,500 as his share of the money. He later gave approximately $2,000 to Guillermo Luis Rigual Almodovar, a co-worker Rodríguez had enlisted in an apparently unsuccessful attempt to find a buyer for the beer, and with whom he had discussed his involvement in the robbery of Narbel.

Santos and Lugo were indicted for their roles in the robberies in 2001 and 2002, respectively. Rodríguez, however, was not indicted until 2004. At that point, both Santos and Lugo had already pleaded guilty and been sentenced, though Santos had appealed his sentence and Lugo's case remained open pending his cooperation in the government's prosecution of Rodríguez.

-4-

Before trial, Rodríguez filed a motion seeking to compel, inter alia, discovery of the Santos and Lugo case files. Rodríguez asserted that this material was exculpatory because of the passage of nearly three years between the indictments of his alleged co-conspirators and his own. Though the motion was unopposed, the district court denied it except insofar as it sought information within the scope of Giglio v. United States, 405 U.S. 150 (1972). The court had also previously ordered the disclosure of Giglio material, together with a host of other discovery, as part of its scheduling order in the case. Rodríguez sought reconsideration of the order denying his discovery motion, which was denied.

At trial, Lugo served as the government's key witness to Rodríguez's role in the robberies, although the jury also heard testimony on that subject from both Rodríguez-Torres and Rigual. Santos did not testify. The jury found Rodríguez guilty on two counts of conspiring to commit robbery interfering with interstate commerce in violation of 18 U.S.C. § 1951(a). He was acquitted on charges of aiding and abetting those robberies and aiding and abetting the use of a firearm to commit them. The jury also completed special verdict forms, submitted in response to the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), indicating their finding beyond a reasonable doubt that both Narbel and Vázquez-Feliciano, who died in the robberies, had

suffered permanent or life-threatening bodily injury--an aggravating factor under the sentencing guidelines.

Prior to the submission of the case to the jury, the government had requested jury interrogatories on a number of other potential enhancements to Rodríguez's sentence under the then-mandatory guidelines, including whether murders had occurred during the course of the robberies. While the district court refused to ask the jury about these factors because they had not been charged in the indictment, it determined that "the occurrence of bodily injury may reasonably be inferred" from the charges and therefore permitted a special verdict form on that issue.

Before Rodríguez was sentenced, however, the Supreme Court issued its decision in United States v. Booker, 543 U.S. 220 (2005), holding that the mandatory application of the sentencing guidelines was unconstitutional. Taking account of the murders of the robbery victims, the presentence report set Rodríguez's base offense level at 43, using the guideline for first-degree murder, rather than robbery. See U.S.S.G. § 2B3.1(c)(1) (2006) (cross-referencing id. § 2A1.1(a)). While this calculation called for a life sentence under the guidelines, Rodríguez faced a statutory maximum of twenty years on each count under 18 U.S.C. § 1951(a).

Rodríguez objected on the theory that his sentence could not be increased based on the murders of the robbery victims because the jury had not made any findings in that regard. He

-6-

argued for a sentence in accordance with the base offense level under the guidelines, elevated only by the fact, as found by the jury, that the victims had suffered serious or life-threatening bodily injury. This calculation, adjusted for Rodriguez's conviction on multiple counts in accordance with U.S.S.G. § 3D1.4 (2006), would have resulted in an offense level of 28, for a guidelines range of 78-97 months.

The district court disagreed, reading <u>Booker</u> to authorize a sentence within the twenty-year range prescribed by 18 U.S.C. § 1951(a), fashioned with due regard for the sentencing factors enumerated in 18 U.S.C. § 3553(a). The court then sentenced Rodríguez to the twenty-year statutory maximum on each count, to be served consecutively, for a total of 480 months.

## II.

Rodríguez makes three claims of error. First, he argues that the district court wrongfully denied him discovery into the government's files on his alleged co-conspirators. Second, he asserts that the district court denied him a fair trial by unduly interfering in the proceedings. Third, he challenges his sentence as imposed in violation of the due process and ex post facto clauses of the Constitution and, in any event, unreasonable. As set forth below, we reject these contentions.

**A.**

Rodríguez claims that the district court's refusal to compel the disclosure of his co-conspirators' files deprived him of his rights under Giglio and its progenitor, Brady v. Maryland, 373 U.S. 83 (1963). Brady requires the prosecution, upon request, to produce material, exculpatory evidence, id. at 87, while Giglio recognizes that this evidence often includes any understandings or agreements as to future prosecution between the government and one of its witnesses. 405 U.S. at 155. Brady does not, however, establish any "'general constitutional right to discovery in a criminal case . . . .'" United States v. Caro-Muniz, 406 F.3d 22, 29 (1st Cir. 2005) (quoting Weatherford v. Bursey, 429 U.S. 545, 559 (1977)). To establish a Brady violation based on the denial of a discovery motion, a defendant must show prejudice, i.e., that he was deprived of material, exculpatory evidence as a result. Id.; see also United States v. Nelson-Rodríguez, 319 F.3d 12, 35 (1st Cir. 2003).

Rodríguez has failed to make that showing here. He does not identify what he hoped to find in his co-conspirators' files, or how it would have helped his defense. He argues, as he did below, that the passage of three years between the indictments of Santos and Lugo and his own, on charges arising out of the same robberies, suggests his innocence. But nothing within the co-conspirators' files was necessary to develop this theory--the

-8-

chronology of the prosecution was apparent from the dates of the indictments themselves.  Furthermore, Santos was not called as a witness, and Lugo was extensively cross-examined on his failure to tell the authorities about Rodríguez's participation in the robberies until after receiving a lengthy sentence for his own role in them.  Counsel for Rodríguez was therefore able to argue to the jury, as he did, that both of these facts served to weaken the government's case.  Accordingly, Rodríguez has not shown that access to the co-conspirators' files would have meaningfully assisted his defense at trial.[1]  See United States v. Dumas, 207 F.3d 11, 16 (1st Cir. 2000) ("Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral.") (internal quotation marks omitted).

Rodríguez further argues that the government failed to provide Giglio material as to Rodríguez-Torres or Rigual, despite the district court's two orders to that effect.  In support of this claim, he notes that Rodríguez-Torres and Rigual were never prosecuted, even though each received money from one of the

_____

[1]Rodríguez also argues that the district court should have undertaken an in camera review of the files.  Simply suggesting that materials in the government's possession may contain exculpatory evidence, however, is generally insufficient to merit in camera inspection.  Caro-Muniz, 406 F.3d at 30.

robberies. Assuming that these facts suggest an agreement or understanding between the government and these witnesses,[2] both Rodríguez-Torres and Rigual were effectively cross-examined about taking the money but not getting charged. As above, then, the failure to provide <u>Giglio</u> material for these witnesses, if any existed, did not prejudice Rodríguez.

**B.**

Rodríguez also claims that the district court failed to conduct his trial in a fair and impartial manner. He asserts that the trial judge reprimanded his counsel, repeatedly interrupted his cross-examination, unfavorably commented on his objections to the prosecutor's questions, and made a series of unpredictable and adverse rulings on the propriety of various questions and evidence. Rodríguez contrasts this rough treatment with the easy time the government had in putting on its case, arguing that it benefitted not only from a series of favorable rulings from the bench but also from the court's helpful questioning of prosecution witnesses. Rodríguez argues that the trial judge thus manifested a hostility toward him, and a corresponding affinity for the government, that influenced the jury to find him guilty.

---

[2]Courts are divided on whether a tacit agreement as to favorable treatment between a witness and the government qualifies as <u>Giglio</u> material. <u>See</u> <u>Bell</u> v. <u>Bell</u>, 460 F.3d 739, 751-56 (6th Cir. 2006) (discussing divergent case law). In light of Rodríguez's failure to show prejudice, we need not reach the issue.

-10-

We have observed that "[t]rial judges are justifiably accorded broad latitude to ensure proper courtroom behavior." United States v. Gomes, 177 F.3d 76, 79-80 (1st Cir. 1999) (citing Liteky v. United States, 510 U.S. 540, 555-59 (1994)). This latitude extends to the court's questioning witnesses on its own behalf, e.g., Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997), and rebuking counsel for inappropriate behavior, e.g., United States v. Candelaria-Silva, 166 F.3d 19, 35 (1st Cir. 1999). But "the judge's participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly." Logue, 103 F.3d at 1045.

Rodríguez's brief recounts dozens of instances, culled from the course of his nine-day trial, that in his view attest to the judge's bias. In our view, however, these instances reflect, on the whole, legitimate "efforts to clarify testimony, expedite the trial, and maintain courtroom decorum." Logue, 103 F.3d at 1045. We must consider alleged examples of judicial bias "in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting." Candelaria-Silva, 166 F.3d at 35 (internal quotation marks omitted). Rather than analyzing each of the numerous claimed instances of judicial bias separately, then, we will address them in summary fashion, explaining why we believe they do not amount to

a due process violation, either individually or collectively. Id. at 36; Logue, 103 F.3d at 1045.

At the outset, we consider Rodríguez's claim that the district judge's favoritism came through in the high number of times she interrupted when counsel for Rodríguez was examining a witness as compared to when the prosecutor was. The government takes issue with Rodríguez's tabulation, arguing that it experienced roughly as many interruptions as he did. Assuming that a phenomenon as vaguely defined as "interruptions" can be accurately counted, we do not consider this sort of comparison to be any more reliable an indicator of a biased judge than the relative number of penalties called against each side in a hockey game indicates a biased referee. The record reveals that, when the district court intervened sua sponte during live testimony, she did so to clarify either a question from counsel or an answer from the witness. As we have noted, this is generally an appropriate role for the judge to play. Logue, 103 F.3d at 1045.

In a similar vein, Rodríguez identifies bias in a number of instances when the judge interceded to restrict his attorney's cross-examination. By and large, however, the district court did not rule certain topics out of bounds; she merely instructed defense counsel to reformulate his inquiries so as to avoid potentially confusing responses. A trial judge "retains wide latitude to impose reasonable limits on cross-examination in order

to avoid confusion . . . ." United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004) (internal quotation marks omitted). The district court did not exceed its discretion in this regard. Indeed, Rodríguez's trial called for particular vigilance from the court, involving, as it did, two different robberies and a number of different participants who had each been previously interviewed by different authorities at different times. The district court thus often interrupted both questions and answers to ask, for example, which robbery was being described, whom among the various men named during the trial was meant by "he," or (as on several of the occasions cited by Rodríguez) which of the witness's prior statements was at issue. We do not see that as evidence of partiality.

Rodríguez also takes exception to a number of times when the district court criticized his counsel for various aspects of his performance. In assessing such a claim, we must "differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality, on the other hand." Candelaria-Silva, 166 F.3d at 35 (internal quotation marks omitted). We believe that the trial judge's comments to Rodríguez's attorney fit squarely in the former category. The great majority were delivered outside the presence of the jury, and "[o]n several occasions, this Court has held that a trial judge's frustration displayed at sidebar does not deprive a defendant of a fair trial." Id.

While, in a few instances, the judge took an arguably harsh tone, we have found far sterner rebukes of counsel or litigants insufficient to demonstrate judicial bias. See, e.g., Logue, 103 F.3d at 1045-46 (court called appellant's lawyer "smart little guy" and, after close of evidence, called appellant "an absolute and incorrigible liar"); Deary v. City of Gloucester, 9 F.3d 191, 194-96 (1st Cir. 1993) (court referred to lawyer's cross-examination as "very devious"); United States v. Polito, 856 F.2d 414, 417-19 (1st Cir. 1988) (court warned counsel he was being reported for violating Rules of Professional Conduct). Furthermore, the court reserved its most pointed reprimands for what, in an objective sense, was the most serious misconduct: two occasions when defense counsel or his colleague was looking at the jurors in what the judge perceived as an inappropriate manner. The handling of those incidents strikes us as entirely defensible, if not outright necessary, and does not fairly suggest prejudice against Rodríguez. See Gomes, 177 F.3d at 80 (noting that justifiable rebukes by judge offer less support to claim of bias).

The district court also showed exasperation with defense counsel in front of the jury from time to time. Although comments made in the presence of the jury generally have a greater potential for unfairness, "appellate courts cannot expect that a trial judge, under siege, will function as a bloodless automaton." Logue, 103 F.3d at 1045. Generally, the district judge corrected Rodríguez's

-14-

attorney before the jury only when he disregarded instructions the court had previously given. Even then, the aspersions were cast in a passing and indirect fashion. Such "warranted and relatively mild" criticism does not indicate judicial partiality. United States v. Balthazard, 360 F.3d 309, 319 (1st Cir. 2004); see also Gomes, 177 F.3d at 80.

The remainder of Rodríguez's judicial bias claim is founded on a series of adverse rulings by the district court on evidentiary and other matters. We have reviewed those rulings and conclude that they, like the other conduct he questions, were well within the court's discretion. See Candelaria-Silva, 166 F.3d at 36. Furthermore, the jury was specifically instructed to "draw no inference against the side to whom admonition of the Court may have been addressed" due to an attorney, "out of zeal for his cause do[ing] something which [was] not in keeping with the rules of evidence or procedure." We have recognized that such a charge usually mitigates any perceived partiality from the bench. See id.; Logue, 103 F.3d at 1045. Considered in its entirety, the district court's handling of the trial did not unfairly disadvantage Rodríguez.

## C.

Rodríguez further asserts that his sentence does not comport with the due process or ex post facto clauses of the Constitution. Rodríguez committed the offenses of conviction in

2001, before the Supreme Court's decision in <u>Booker</u>, but was sentenced in 2005, after <u>Booker</u>. We have held that <u>Booker</u>'s change to the federal sentencing regime, from mandatory to advisory guidelines, cannot support an ex post facto claim. <u>United States</u> v. <u>Lata</u>, 415 F.3d 107, 110 (1st Cir. 2005).

Rodríguez's due process argument is likewise unavailing. In <u>Lata</u>, we left open the possibility of such a claim where "a sentence is imposed for a pre-<u>Booker</u> crime that is higher than any that might realistically have been imagined at the time of the crime or based on factors previously discouraged, prohibited, or not recognized under the guidelines." <u>Id.</u> at 112. That did not happen here. To the contrary, Rodriguez was sentenced in accordance with the guidelines in effect at the time of his crimes, which dictated a base offense level of 43 for robbery if the victim was killed under circumstances constituting first-degree murder. U.S.S.G. §§ § 2A1.1(a), 2B3.1(c)(1) (2000).

That the district court initially ruled the murders out of bounds for sentencing purposes based on its understanding of <u>Blakely</u>, but later reversed course based on its understanding of <u>Booker</u>, does not offend due process. We have squarely rejected the notion that a guidelines-driven sentence for a pre-<u>Booker</u> offense creates a constitutional "fair warning problem." <u>United States</u> v. <u>Perez-Ruiz</u>, 421 F.3d 11, 15 (1st Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1092 (2006). As we reasoned, "[a]t the time of [Rodríguez's]

-16-

crime[s]--indeed, until the morning that Booker was announced by the Supreme Court--[Rodríguez] faced a foreseeable risk that any crime he committed would result in a guideline sentence (within the statutory maximum) based on judge-made fact-finding. That is exactly what he got in this case." Id.

Although Rodríguez also calls his sentence unreasonable, he offers nothing to support this claim other than a challenge to the sufficiency of the district court's explanation. At the conclusion of the sentencing hearing, the court announced that it had "considered all the applicable adjustments under the now Advisory Federal Sentencing Guidelines, as well as the other sentencing factors set forth in 18 [U.S.C. §] 3533(a)," and went on to enumerate those factors before imposing consecutive sentences of 240 months on each count of conviction. While the judge did not separately discuss her application of each of the statutory sentencing factors, we have recognized that "a court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did." United States v. Jimenez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc).

Both the pre-sentence report and the government's presentation at the sentencing hearing focused on the murders committed during the robberies and their effect on the victims' families. Rodríguez, for his part, attempted to cast himself as an

honest and hardworking man for whom the robberies were uncharacteristic behavior.[3]  In response, the government pointed out that Rodríguez had joined in the conspiracy to rob the beer truck with the same person, Santos, who had shot and killed the victim during the first robbery, so that in essence Rodríguez had knowingly put a gun in the hand of a demonstrated murderer.  We can infer from the course of the sentencing proceedings, then, that the district court considered factors such as the nature and circumstances of the offenses, the need to provide just punishment in light of their seriousness, and the need to protect the public from further crimes of the defendant to weigh more heavily than factors such as the defendant's history and characteristics in the sentencing calculus.  In any event, Rodríguez makes no effort to explain to us why he deserved a lesser sentence.

### III.

For the foregoing reasons, we **affirm** Rodríguez's conviction and sentence.

---

[3]Rodríguez also disputed the connection between the murders and his agreement to participate in the robberies.  He has not, however, resurrected that point on appeal.