# United States Court of Appeals
## For the First Circuit

Nos. 14-1692
    14-1870
    14-1919
    14-2098

UNITED STATES OF AMERICA,

Appellee,

v.

MANUEL DE JESÚS ROSARIO-PÉREZ; JORGE GÓMEZ-GONZÁLEZ, a/k/a Jorge
Cara de Truck; BRYANT SETIAWAN-RAMOS, a/k/a Chino; and SANTIAGO
HERNÁNDEZ-ROSA, a/k/a Chago Coyote,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Dyk,* Circuit Judges.

José R. Olmo-Rodríguez for appellant Manuel de Jesús Rosario-
Pérez.
    Rafael F. Castro Lang for appellants Jorge Gómez-González,
Bryant Setiawan-Ramos, and Santiago Hernández-Rosa.
    William A. Glaser, Attorney, Appellate Section, Criminal
Division, U.S. Department of Justice, with whom Leslie R. Caldwell,
Assistant Attorney General, Sung-Hee Suh, Deputy Assistant

---

* Of the Federal Circuit, sitting by designation.

Attorney General, <u>Rosa E. Rodríguez-Vélez</u>, United States Attorney, <u>Mariana E. Bauzá-Almonte</u>, Assistant United States Attorney, Appellate Chief, <u>G. Andrew Massucco</u>, Assistant United States Attorney, and <u>Elba Gorbea</u>, Assistant United States Attorney, were on brief, for appellee.

————————————

April 29, 2020

————————————

**HOWARD**, **Chief Judge**.  After a thirty-five-day trial, a jury convicted Manuel De Jesús Rosario-Pérez ("Rosario"), Jorge Gómez-González ("Gómez"), Bryant Setiawan-Ramos ("Setiawan"), and Santiago Hernández-Rosa ("Hernández") of various drug and weapons charges.  On appeal, these defendants argue that reversible errors infected nearly every stage and aspect of their trials.  Finding most of the claims without merit, we affirm as to Rosario, Gómez, and Hernández but vacate Setiawan's convictions and remand his case for a new trial.

## I.  Background

We present the facts in the light most favorable to the jury verdict, see United States v. Naranjo-Rosario, 871 F.3d 86, 90 (1st Cir. 2017), reserving some details to our analysis of the issues raised on appeal.

The defendants were convicted for their participation in a massive drug-trafficking conspiracy that operated various drug distribution points in Puerto Rico, including one in Old San Juan's La Perla community called "La Boveda."  Each defendant was indicted for conspiracy to distribute drugs within 1,000 feet of a school (Count One) and possession with intent to distribute heroin (Count Two), cocaine (Count Three), and marijuana (Count Four).  The indictment also charged everyone but Rosario with carrying and using firearms in relation to drug trafficking (Count Five).

The defendants' joint trial featured testimony from several cooperating witnesses, including "Flow," "Willyboy," and "Cascote." Rosario, a street-level seller, was convicted on Counts One, Three,[1] and Four, and was sentenced to time served. Setiawan, a "little boss," was convicted on all counts and sentenced to life imprisonment plus five years. Hernández, the "owner" of certain "brands" sold at La Boveda, was convicted on all five counts and received a 30-year concurrent sentence on Counts One through Four, plus five years on Count Five. Gómez, the conspiracy leader, was convicted on Count One and sentenced to a 30-year term of imprisonment.

For ease of exposition, we will first discuss arguments specific to each individual defendant and then move to those arguments common to all the appellants.

## II.  Rosario

Rosario assails his conviction on two individual grounds: evidentiary sufficiency and prejudice from eventually stricken flight evidence.  Neither argument succeeds.

A.  Sufficiency

Rosario argues that the evidence was insufficient to convict him on Count One (conspiracy) and Count Four (marijuana

---

[1] As we discuss below, the district court granted Rosario a judgment of acquittal on this count due to an inconsistency in the jury's special verdict.

possession).  "When reviewing the sufficiency of the evidence, we reverse only if the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt."  United States v. Tavares, 705 F.3d 4, 17–18 (1st Cir. 2013) (citation omitted). In other words, "[w]e need not conclude that no verdict other than a guilty verdict could sensibly be reached but must only be satisfied that the verdict finds support in a plausible rendition of the record."  United States v. Liriano, 761 F.3d 131, 135 (1st Cir. 2014) (citation omitted).  When conducting this de novo review, see id., we will not "weigh evidence or assess credibility."  Tavares, 705 F.3d at 18.

### 1.  Count One: conspiracy

To convict Rosario of conspiracy to distribute drugs, "the government must prove beyond a reasonable doubt that an agreement existed to commit the underlying offense and that [Rosario] elected to join the agreement, intending that the underlying offense be committed."  Liriano, 761 F.3d at 135 (citing United States v. Paret-Ruiz, 567 F.3d 1, 5 (1st Cir. 2009)). Rosario's agreement to join the conspiracy could have been "express or tacit" and the government could prove it by "direct or circumstantial evidence."  Id. (citation omitted).  "In conducting our sufficiency analysis, we remain aware that the government may provide evidence sufficient to convict without showing that: (1)

- 5 -

each conspirator knew of or had contact with all other members; (2) each conspirator knew of all the details of the conspiracy or participated in every act in furtherance of it; or (3) the conspiratorial 'cast of characters' remained intact throughout the duration of the entire enterprise." United States v. Cruz-Rodríguez, 541 F.3d 19, 28 (1st Cir. 2008).

Rosario argues that there was no evidence linking him to any of the conspirators: although he was arrested allegedly selling drugs at La Boveda, the drugs attributed to him did not have a seal or other marking belonging to one of the "brands" commonly sold at the drug point. At most, Rosario claims, he was an independent seller operating at the drug point.

Not so. Although we agree that "'mere presence at the scene of the crime' or 'mere association with conspirators' is not enough to establish guilt," United States v. Llinas, 373 F.3d 26, 32 (1st Cir. 2004) (quoting United States v. Gómez-Pabón, 911 F.2d 847, 853 (1st Cir. 1990)), we have long recognized that "the mere presence defense is not so ubiquitous as to envelop every drug-trafficking case in which the government lacks direct evidence of a defendant's complicity," id. (quoting United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993)). Like Echeverri itself, this is a case in which "a defendant's 'mere presence' argument will fall [because] the 'mere' is lacking." 982 F.2d at 678.

A reasonable jury could conclude that Rosario sold drugs at La Boveda and that he did so as part of the conspiracy. One police officer testified that he had seen Rosario "[s]elling controlled substances in La Perla, at La Boveda." Another officer testified that when he arrested Rosario after a chase at La Boveda, Rosario possessed eighty-one baggies of marijuana, twenty-six baggies of cocaine, and over $100 in cash. Flow testified that he had seen Rosario "hanging out" at the drug point.[2] And Willyboy told the jury that he had seen Rosario selling "mostly cocaine and marijuana" at the drug point on multiple occasions.

Evidence also showed that the conspiracy's leaders established certain rules for sellers operating at La Boveda, from establishing standard drug prices to dictating where sellers could market their drugs. Sellers also pooled their money to hire lookouts. The jury could have inferred that Rosario, as a seller at La Boveda, was also subject to these rules and therefore participated in the conspiracy. See United States v. Mena-Robles, 4 F.3d 1026, 1032 (1st Cir. 1993) (noting that, in some conspiracies, "there are circumstances where presence itself implies participation" (quoting United States v. Ortiz, 966 F.2d

_____

[2] Rosario interprets Flow's testimony as establishing that Rosario "was not a member" of the conspiracy. We disagree. Flow never testified that Rosario "was not a member," nor did he contradict other witnesses who testified that Rosario was, in fact, selling as part of the conspiracy.

707, 712 (1st Cir. 1992))). "While these factual conclusions are not the only ones the jury could have reached, we find them . . . reasonable." Id. Therefore, we find the evidence sufficient to support Rosario's drug-conspiracy conviction.

### 2. Count Four: marijuana

Rosario claims that the evidence was insufficient on this count because there is no way that the jury could have believed testimony that he sold marijuana and cocaine at the drug point. The jury convicted Rosario of possession with intent to distribute cocaine but found no amount of cocaine attributable to him. This inconsistency, Rosario maintains, establishes that the jury did not believe the witnesses who connected Rosario to cocaine; so, to the extent that the same witnesses connected Rosario to marijuana, the jury must have disbelieved them on the marijuana question too. Once we eliminate this testimony, Rosario concludes, there is not enough evidence left to convict him on the substantive marijuana count.

We disagree. Inconsistent verdicts "often are a product of jury lenity." United States v. Powell, 469 U.S. 57, 65 (1984). Therefore, sufficiency review on one count "should be independent of the jury's determination that evidence on another count was insufficient." Id. at 67; see also Mena-Robles, 4 F.3d at 1031 ("[T]he jury is empowered to accept or reject, in whole or in part, any testimony."). Furthermore, Rosario was arrested while fleeing

La Boveda with eighty-one baggies of marijuana.  "[I]ntent to distribute drugs can legitimately be inferred from factors [including] quantity . . . ."  Echeverri, 982 F.2d at 678.  The evidence was sufficient to support Rosario's conviction on the substantive marijuana count.

## B.  Prejudice from stricken flight evidence

Before trial, the court sent Rosario to an inpatient drug-treatment program.  Shortly thereafter, Rosario absconded from the treatment center and evaded capture for nearly two weeks.  Over Rosario's objection, a deputy marshal testified at trial that he subsequently found and arrested Rosario.  Initially, the district court indicated that it was planning to instruct the jury that flight evidence could be probative of consciousness of guilt, but ultimately it instructed the jury that the marshal's testimony was "not to be taken into consideration."  Moreover, when charging the jury, the court offered this reminder: "Anything I have excluded from evidence or ordered stricken and instructed you to disregard is not evidence.  You must not consider such items."

On appeal, Rosario argues that, because the other evidence against him was so weak, the jury probably convicted him based on impermissible flight evidence.  Not only do we doubt that the district court abused its discretion by initially admitting the flight evidence, see United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005), but the court also mitigated any potential

damage with its later curative instruction. As we have recognized time and again, "within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions," even if the instructions do not follow immediately upon the problematic remark. United States v. Ayala-Vázquez, 751 F.3d 1, 26 (1st Cir. 2014) (quoting United States v. Pagán-Ferrer, 736 F.3d 573, 587 (1st Cir. 2013)).

In light of both the court's instructions and the evidence against Rosario, which was sufficient to convict even without the flight evidence, we see no reason to believe that the jury convicted Rosario based on the stricken flight evidence. See id. at 25-27 (presumption that jury followed court's curative instruction is overcome only in "rare circumstances implying extreme prejudice" (emphasis omitted) (quoting United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000)).

### III. Setiawan

As part of its conspiracy case, the government presented evidence that Setiawan shot and killed "Teton," a drug seller indebted to Setiawan. On appeal, Setiawan claims that the district court erred by: (1) admitting evidence that Setiawan killed Teton; (2) excluding evidence that Cascote killed Teton; and (3) making its sentencing determinations. In short, we conclude that the district court's decision to admit the murder evidence while

- 10 -

excluding the exculpatory evidence was not proper and that the cumulative effect of the decision warrants a new trial. Because we remand for a new trial, we do not reach Setiawan's sentencing claims.

A.  Admitting Murder Evidence

Setiawan argues that the district court constructively amended the indictment by admitting evidence that he killed Teton. Essentially, Setiawan argues that he was charged with a conspiracy to distribute drugs -- not the separate offense of killing someone during the course of a drug crime -- so evidence of Teton's murder could not be presented as an overt act of the drug-distribution conspiracy.  Setiawan did not preserve this claim at trial, so as both parties agree, we review for plain error.  See United States v. Brandao, 539 F.3d 44, 60 (1st Cir. 2008).

Although Setiawan makes a constructive-amendment argument, it is unclear whether his complaint would be described more appropriately as a variance from the indictment.  See United States v. Rodríguez-Rodríguez, 663 F.3d 53, 58 n.6 (1st Cir. 2008) ("The line [between the two doctrines] is inherently fuzzy.") (citation omitted).  A constructive amendment occurs when the difference between the indictment and the proof at trial is so great that the defendant was essentially convicted of a charge for which he was not indicted; a variance occurs when the charge is unchanged, but the facts proved at trial are different from those

alleged in the indictment.  See United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993).  Ultimately, it does not matter whether we construe Setiawan's argument as one of constructive amendment or variance -- neither occurred here.

The introduction of evidence at trial that Setiawan murdered Teton did not constructively amend the indictment, which charged Setiawan with, among other things, conspiracy to possess with intent to distribute controlled substances under 21 U.S.C. § 846.  The government is not required to allege or prove any overt act as an element of a § 846 conspiracy.  See United States v. Vega-Figueroa, 234 F.3d 744, 754 (1st Cir. 2000) (citing United States v. Shabani, 513 U.S. 10, 13 (1994)).  Therefore, the government's gratuitous proof of an overt act relevant to the conspiracy -- Teton's murder -- "does not involve an alleged constructive amendment of [the indictment] to include an 'offense not charged by the grand jury.'"  United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005).  "(quoting United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985))."

Setiawan is mistaken in his argument that this is the first time that murder evidence has been introduced as an overt act in a drug conspiracy under 21 U.S.C. §§ 841(a)(1) and 846. We have recognized, but found unavailing, the contention that admitting this sort of evidence "arguably carrie[s] the risk of turning a drug conspiracy case into a murder case."  United States

- 12 -

v. Rivera Calderón, 578 F.3d 78, 99 (1st Cir. 2009). Here, the murder evidence does "not appear to have been calculated to arouse the passions of the jury," so its admission is not reversible error. Id. at 98. Setiawan merely asserts without development that the murder evidence was unfairly prejudicial. Even if his argument were not waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), after careful review, we note that the relevant testimony was presented in a manner similar to that approved of in Rivera Calderón -- the witnesses "described the murder[] matter-of-factly, stating that [Teton was] shot but leaving out graphic details." 578 F.3d at 98.

Further, "[t]here is no variance" when, as here, a defendant "does not contend that the government failed to prove [the indictment's] allegations at trial" but "argues that he was charged only with [those] acts, and that the government 'varied' from the indictment by offering additional evidence." United States v. Innamorati, 996 F.2d 456, 477–78 (1st Cir. 1993) (emphasis in original).

In Vega-Figueroa, we rejected a variance claim like Setiawan's. There, the defendant claimed that the trial evidence of his involvement in a drug-trafficking conspiracy -- including his involvement in an uncharged murder -- impermissibly varied from the indictment, which did not mention the murder. 234 F.3d at 753. We determined that there was "no basis" for a variance

- 13 -

claim because the government was not limited at trial only to those overt acts alleged in the indictment. Id. at 754. Differently stated, "[t]he fact that the government proved aspects of the conspiracy beyond those recited in the indictment . . . simply does not constitute a variance." Fisher, 3 F.3d at 463.

Finally, even if there had been a constructive amendment or variance, Setiawan could not demonstrate prejudice under the plain-error standard because he does not dispute that he had advance notice of the murder evidence. See Brandao, 539 F.3d at 62-63 (finding that the constructive amendment did not "seriously jeopardize" the defendant's rights when, among other things, he "was provided adequate notice of the charges against him"); Fornia-Castillo, 408 F.3d at 67 (concluding that the variance was not prejudicial when the defendant "had ample notice of and ample opportunity to prepare to meet the government's evidence before trial").

In Rivera-Donate, for instance, we declined to find a prejudicial variance when the defendant could not 'credibly claim surprise' about the government's proof at trial. Id. At 130 (quoting United States v. Marrrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998)). Setiawan knew that he was under indictment for participating in a drug-distribution conspiracy, and "he knew that his central defense needed to be that he was not part of that [conspiracy]." United States v. Alicea-Cardoza, 132 F.3d 1, 6

- 14 -

(1st Cir. 1997).  Therefore, he cannot demonstrate prejudice under the plain-error standard.

## B.  Excluding Exculpatory Evidence

Setiawan maintains that the district court improperly excluded evidence supporting his defense that Cascote, rather than Setiawan, killed Teton.  First, Setiawan argues that the district court improperly excluded hearsay testimony admissible under the statement-against-interest exception.  Second, Setiawan argues that the district court erred by striking a witness's testimony following the witness's refusal to answer the prosecution's questions on cross-examination.  We review for abuse of discretion. See United States v. Monserrate-Valentín, 729 F.3d 31, 52 (1st Cir. 2013); United States v. Baskin, 424 F.3d 1, 3 (1st Cir. 2005).

### 1.  Hearsay statement

Setiawan wanted Luis Rivera-Melendez ("Rivera"), a codefendant who had pleaded guilty, to testify that he was present at Teton's murder and that Cascote, not Setiawan, was the killer. But Rivera invoked the Fifth Amendment and refused to testify. The district court ruled that Rivera's testimony risked self-incrimination and deemed Rivera unavailable as a witness.  See Fed. R. Evid. 804(a)(1).

Setiawan then attempted to call a defense attorney, Miriam Ramos-Grateroles ("Ramos"), who had been present when Setiawan's attorney interviewed Rivera in prison.  Ramos testified

- 15 -

outside the jury's presence that Rivera told Setiawan's counsel that he witnessed Cascote shoot Teton at a drug point. Setiawan argued that Ramos's testimony relaying Rivera's out-of-court statement was admissible under the statement-against-interest exception because the statement placed Rivera at a drug point, exposing him to criminal liability. See Fed. R. Evid. 804(b)(3).

The district court excluded the statement. The court reasoned that Ramos's testimony would be "inherently unreliable" because she would not be subject to cross-examination about the drug-trafficking conspiracy or the murder. The court's ruling did not depend on either criterion relevant to admitting evidence under Rule 804(b)(3), namely, that the hearsay statement must be against the out-of-court declarant's interest and the statement must be corroborated. See id.

The court's basis for excluding the hearsay statement i.e., that Ramos would not be subject to cross-examination about the conspiracy or murder -- was improper. In-court witnesses who relay hearsay statements are never subject to cross-examination about the substance of out-of-court statements. The Federal Rules of Evidence exclude hearsay statements generally, see Fed. R. Evid. 802, in large part because of an opponent's inability to cross examine the in-court witness on the substance of the out-of-court statement. See Williamson v. United States, 512 U.S. 594, 598 (1994). The Rules provide exceptions to admit certain hearsay

statements, however, because either the substance of the statement, see, e.g., Fed. R. Evid. 803(4) (statement made for medical diagnosis or treatment), or the way the declarant makes the statement, see, e.g., Fed. R. Evid. 803(2) (excited utterance), provides a measure of reliability sufficient to warrant admission, even though neither the out-of-court witness nor the in-court witness is subject to cross-examination on the statement's substance. See Williamson, 512 U.S. at 598-99.

Additionally, when the district court excluded the testimony because it was "inherently unreliable," the court usurped the jury's role. Reliability and credibility of in-court witnesses are matters for the jury to determine. See, e.g., United States v. Barone, 114 F.3d 1284, 1300 (1st Cir. 1997). In fact, we have rejected precisely what occurred in this case. In United States v. Seeley, this court agreed with a Second Circuit decision holding that Rule 804(b)(3) does not require the trial court to make a special assessment of the credibility of a witness who relays an out-of-court declaration against penal interest. See United States v. Seeley, 892 F.2d 1, 3 (1st Cir. 1989) (citing United States v. Katsougrakis, 715 F.2d 769, 777 (2d Cir. 1983)). Undoubtedly, a district court may exclude evidence on grounds other than credibility, see, e.g., Fed. R. Evid. 403, but credibility of in-court witnesses is exclusively the jury's province, see Seeley, 892 F.2d at 3. As a result, the district court improperly excluded

- 17 -

Ramos's testimony when it concluded the testimony would be "inherently unreliable" because the government would not be able to cross examine her about the murder or conspiracy. The district court erred by excluding testimony that should have been admitted under Rule 804(b)(3).

### 2. Striking Colon's Testimony

Setiawan's attorney also called David Colon-Geigel ("Colon"), a coconspirator, as a witness to rebut the murder accusation. In response to questioning from Setiawan's attorney, Colon explained that he was Cascote's right-hand man, that Cascote is the godfather of his oldest son, and that Colon sold drugs for Cascote. Colon also testified that he witnessed Cascote shoot Teton and that Flow, the government's only purported eyewitness to the murder, was not near the site of the shooting. After Setiawan's attorney finished questioning Colon, the three other defense attorneys each asked whether their clients had any role in the drug trafficking in La Perla; Colon responded that none of them did.

On cross-examination, the government asked about Colon's drug-trafficking activities and the defendants' involvement. Then, the government asked further questions about other members of the conspiracy who had been indicted in this case and pleaded guilty, including Flow who had testified that Setiawan shot Teton. Colon answered the questions. When the government began asking

about unindicted members of the conspiracy, Colon refused to answer the questions:  "Well, what happens is I don't want to be talking like this.  I don't want to incriminate anyone else."  After dismissing the jury and summoning Colon's attorney, the judge and attorneys reconvened, at which point the prosecutor explained that he planned to show Colon one hundred photographs and seven videos to probe his knowledge of the conspiracy generally covering the unindicted coconspirators.  The government requested that the district court strike Colon's entire testimony because he was refusing to answer questions about the conspiracy.

With his attorney present, Colon was asked by the district court about what questions he intended to answer:

> The Court:  Sir, you testified and you stated that you were not going to testify anything further relating to any other defendant but these four defendants.
>
> The Witness:  Yes.
>
> The Court:  Is that still the case?
>
> The Witness:  I am not going to testify.

In a bench conference, Colon's attorney stated that "[Colon] has stated clearly that he [wa]s going to refuse to testify to any further questions."  The district court continued to discuss the question whether Colon's testimony should be stricken.  Colon's attorney apparently left the courtroom.  The district court then asked Colon two more questions:

The Court:  So that means that you are not going to answer any questions as to Setiawan?

The Witness:  No.

The Court:  And that means that you are not going to answer any further questions as to any further defendants that are here?

The Witness:  I would answer questions if I wasn't asked questions regarding people that are not present here.

Colon's statements were ambiguous about whether he was refusing to answer questions about only unindicted coconspirators or also questions involving Teton's murder.  Even Colon's "no" answer to the first question regarding Setiawan is unclear whether he meant to say he would or would not answer questions about him.  Nonetheless, the district court ordered Colon's testimony stricken, subject to reconsideration if Colon's attorney "allows him to talk."  The attorney for Colon later reappeared and stated that "I went to the cellblock and I spoke with David Colon Geigel.  He reiterated his position to testify about anyone."  This representation did little to clarify Colon's intention and appeared inconsistent with Colon's last statement that "I would answer questions if I wasn't asked questions regarding people that are not present here."  Nevertheless, the district court made no further effort to clarify the scope of Colon's refusal.

Despite the ambiguity of Colon's refusal, the district court granted the government's request to strike his testimony.

The court initially reasoned that attorneys for the defendants other than Setiawan opened the door to the conspiracy questions. Ultimately, however, the court concluded that Setiawan's attorney's having asked Colon about Cascote and Colon's responses opened up all questions related to the conspiracy, because Cascote was a leader of the conspiracy. Further, the court explained, even the murder-related questioning opened the door for cross-examination about the entire conspiracy because the murder was part of the conspiracy. On this basis, the district court struck Colon's entire testimony, including his direct testimony about Teton's murder.[3]

"The Sixth Amendment guarantees criminal defendants the right to present a defense, but that right is subject to the government's legitimate interest in testing the truth of testimony offered by the defense through cross-examination." United States v. Bartelho, 129 F.3d 663, 673 (1st Cir. 1997). Therefore, "[a] trial judge may strike a witness's direct testimony if he flatly refuses to answer cross-examination questions related to the details of his direct testimony." Id. (internal quotation marks omitted). But if the prosecution asks about collateral matters -- matters that are not "of consequence to the case" -- the district court should "protect the defendant's right to present his defense,

_____

[3] Striking the entire testimony, the district court instructed Setiawan's attorney: "I am sorry. Appeal the ruling. There you have a very good potential appeal issue."

if possible." Id. (citing United States v. Gary, 74 F.3d 304, 310 (1st Cir. 1996); United States v. Morla-Trinidad, 100 F.3d 1, 5 n.4 (1st Cir. 1996)).

In certain circumstances, a district court may strike a witness's testimony in its entirety, rather than merely restricting the scope of cross-examination. See, e.g., United States v. De La Cruz, 996 F.2d 1307, 1313 (1st Cir. 1993). But here, unlike in De La Cruz, "effective government cross-examination" about Teton's murder would not have been "seriously impaired" if the prosecutor was not allowed to ask Colon about nearly one hundred other coconspirators who had no relation to the murder-related testimony. The prosecutor could still inquire about Colon's relationships with Setiawan and Cascote and Colon's version of events on the night of the murder.

Colon's testimony presented the district court with a challenging situation. Before the government was able to finish cross examining Colon about Teton's murder, Colon stopped answering questions. As discussed earlier, it is unclear from the record whether Colon was refusing to answer questions covering unindicted members of the conspiracy, a matter collateral to Teton's murder, or broader questions concerning the murder.

While the murder was part of the conspiracy, the extent of the conspiracy and the participation, or lack thereof, of hundreds of coconspirators constitute issues collateral to the

murder. In other words, the murder is "within the scope" of the conspiracy, but the conspiracy is not "within the scope" of the murder, and the coconspirators' participation is not "of consequence to the resolution of the issue[]" of who murdered Teton. United States v. Castro, 129 F.3d 226, 231 (1st Cir. 1997). Because the record was unclear whether Colon was refusing to answer questions relating only to such collateral issues, the district court clearly erred by striking Colon's testimony without ascertaining whether his refusal pertained to the murder or not just collateral matters relating to unindicted coconspirators. See Bartelho, 129 F.3d at 673.

C. Cumulative Prejudicial Effect

Because the court admitted evidence that Setiawan committed the murder, we hold that under the Constitution or, failing that, under the court's supervisory power to make the rules of evidence just and fair in application, Setiawan must be permitted to offer evidence to show that he did not commit the murder. Under the current record, the district court erred by precluding Setiawan from doing so by excluding the testimonies of Ramos and Colon.

In a nutshell, it is not appropriate that prejudicial and highly inflammatory evidence -- here, that Setiawan killed Teton in the course of the conspiracy -- could be admitted without giving Setiawan an opportunity to show by reasonable evidence that

he did not commit the murder.  The rules of evidence are instituted not for the splendor of their being but rather to make courts administer fair and just trials.  See Fed. R. Evid. 102 ("These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination.").  Where the stakes are very high, it is a court's job to make sure that the rules themselves are not made an instrument of injustice.

We should not be read to overly fault the highly capable trial judge.  In the high-speed context of trial, a trial judge can do little else than make quick rulings and go where the proceedings lead him or her.  But with the time and space to see the whole trial in context, we are not merely free but bound to prevent a manifest injustice.  Cf. United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  And while appeals courts do not often have to exercise this function, they do it when they must, offering various explanations depending on what occurred at the lower-court proceedings.  See, e.g., United States v. Sanabria, 645 F.3d 505, 516-19 (1st Cir. 2011); United States v. Dwyer, 843 F.2d 60, 65 (1st Cir. 1988).

The matter can be put in many different ways, and one way may be more apt than others depending on the precise issue.  A perfectly admirable example is our ruling in United States v.

Lombard in which the combined application of individually well-accepted sentencing doctrines violated the Due Process Clause. See United States v. Lombard, 72 F.3d 170, 175-87 (1st Cir. 1995). The opinion in that case invoked the common-sense adage that the whole is sometimes greater than the sum of its parts and that the whole is what matters. See, e.g., id. at 175, 177.

We think the most certain basis for ordering a new trial, albeit a basis that rarely has to be invoked, is what we have just said: that reexamined in the leisure of an appeal, to allow evidence that Setiawan murdered Teton and disallow plausible evidence that he did not based on erroneous rulings is an unacceptable result. On that basis, Setiawan's convictions must be reversed, and the case remanded for a new trial.

### IV. Hernández

Hernández raises one argument specific to his case: that the district court should have declared a mistrial, or at least given a curative instruction, after a police officer testified about a Glock handgun and white powder recovered during a search of Hernández's home. Hernández neither contemporaneously objected to the evidence's admission nor moved for a mistrial, so we review for plain error. See United States v. Walker, 665 F.3d 212, 229 (1st Cir. 2011) (unpreserved lay opinion objection reviewed for plain error); United States v. Panet-Collazo, 960 F.2d 256, 260 (1st Cir. 1992) (same for belated mistrial request).

At trial, the officer testified that, while searching Hernández's home pursuant to a warrant, he found "controlled substances[, i.e.] a white, powdery substance" and a 9mm Glock hidden in a secret compartment in some furniture.[4] Hernández argues that the officer's statements identifying the white powder as drugs constituted inadmissible lay-opinion testimony under Federal Rule of Evidence 701 because the government did not build a foundation sufficient to establish that the officer could identify the powder as drugs simply by looking at it.

We need not reach this question, however, because Hernández cannot establish prejudice under the plain-error standard. Multiple witnesses testified that Hernández sold thousands of dollars' worth of heroin every week and that he carried a handgun at the drug point. We will not find plain error when "the challenged testimony constituted a tiny part of the government's case." Walker, 665 F.3d at 230 (further noting that "it is wildly implausible that the jury would have reached a different conclusion . . . in the absence of [the challenged] testimony").

---

[4] We do not address Hernández's other claims of error, which "lack arguable merit," relating to the evidence seized from this search. United States v. Rose, 802 F.3d 114, 117 (1st Cir. 2015).

## V. Gómez

Gómez principally argues that the district court deprived him of his constitutional rights to present a defense and to a fair trial by refusing to allow the jury to consider voluminous Spanish-language documents related to his defense that he was too busy being a community leader to have the time to be a drug-conspiracy leader. The district court provisionally admitted the Spanish-language exhibits, delayed jury deliberations for nearly one week to allow for translation, and ultimately instructed the jury not to consider the untranslated documents.

Gómez objected at trial, so the government urges us to apply the abuse-of-discretion standard. See United States v. Pires, 642 F.3d 1, 13 (1st Cir. 2011). Under any standard of review, the district court did not err when it complied with its statutory duty to refuse to allow the jury to consider untranslated documents.

The Jones Act requires "[a]ll pleadings and proceedings" in the District of Puerto Rico to be "conducted in the English language." 48 U.S.C. § 864. We have been clear that this is an "independent duty of the district court" grounded in a policy of integrating Puerto Rico with the rest of the United States and that this duty is "too great to allow parties to convert [the district] court into a Spanish language court at their whim." United States v. Millán-Isaac, 749 F.3d 57, 63 (1st Cir. 2014)

(citation omitted).  "[T]he duty of the [district] court to ensure compliance with the Jones Act is not lessened in cases where counsel . . . encourages the district court to set aside the English-language requirement."  Id. (citation omitted).  Here, the district court, mindful of its duty, appropriately denied Gómez's request.[5]

## VI.  District court's behavior

Collectively, the defendants claim a passel of errors based on the district court's behavior at trial.[6]  In short, we find no reversible error.

### A.  Reference to a potential appeal

Attempting to resolve a computer glitch affecting contemporaneous transcription of witness testimony, the district court told the prosecutor "I know you are satisfied, but if the record says contrary . . . Boston is going to hear something else, right?  If it goes on appeal."  The defendants moved for a mistrial, arguing that this fleeting reference to a potential appeal signaled to the jury that the judge believed they were guilty.  We review the district court's denial of the defendants' mistrial motion for abuse of discretion.  Ayala-Vazquez, 751 F.3d at 23.  Upon review,

---

[5] We note that Gómez was able to present this theory through multiple witnesses at trial, notwithstanding the documents' exclusion.

[6] After careful review, we do not address several of these claims, which "lack arguable merit."  Rose, 802 F.3d at 117.

it is clear that the district court sought only to ensure the accuracy of its record; it did not give "the jury an impression that the court believe[d] the defendant[s were] guilty."  United States v. Laureano-Peréz, 797 F.3d 45, 70 (1st Cir. 2015)(citation omitted).  There was no error here.

B.  Court's comments at trial

According to the defendants, some of the district court's comments at trial (and its questioning of witnesses in particular) "tipped the scales in favor of the prosecution" and deprived them of a fair trial.  We review for abuse of discretion.[7] Ayala-Vazquez, 751 F.3d at 23.  In so doing, we must consider "isolated incidents in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting."  United States v. Candelaria-Silva, 166 F.3d 19, 35 (1st Cir. 1999) (quoting United States v. Montas, 41 F.3d 775, 779 (1st Cir. 1994)).

"It cannot be gainsaid that [a] fair trial in a fair tribunal is a basic requirement of due process.  Accordingly, a

---

[7] Abuse-of-discretion review also applies to Hernández's favoritism argument: that the district court pressured the defense to finish quickly.  See United States v. Romero-López, 695 F.3d 17, 21 (1st Cir. 2012).  Such abuse will be "found only where the Court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Id. (quoting United States v. Mangual-Santiago, 562 F.3d 411, 429–30 (1st Cir. 2009)).  Upon thorough review, we find no abuse of discretion here.

trial judge should be fair and impartial in his or her comments during a jury trial." Ayala-Vázquez, 751 F.3d at 23-24(alteration in original) (quoting United States v. de la Cruz-Paulino, 61 F.3d 986, 997 (1st Cir. 1995)). We recognize, however, that "mere active participation by the judge does not create prejudice nor deprive the party of a fair trial." Id. at 24 (quoting Deary v. City of Gloucester, 9 F.3d 191, 194 (1st Cir. 1993)). Therefore, the defendants must both "demonstrate that the trial court's actions rise to the level of bias," and "meet [their] burden of demonstrating serious prejudice." Candelaria-Silva, 166 F.3d at 36.

Although our careful review of the briefs and transcripts leads us to believe that the district court's approach was evenhanded and thus not improper, cf. United States v. Santana-Pérez, 619 F.3d 117, 124-25 (1st Cir. 2010) (holding it improper to question defendant-witness in a different "tenor" than prosecution witnesses), we ultimately need not determine the propriety of each and every comment, because the defendants cannot show serious prejudice. See Ayala-Vázquez, 751 F.3d at 25.

The district court's repeated curative instructions were sufficient to ward off any serious prejudice. See id. at 26 ("We have long recognized in this Circuit that 'within wide margins, the potential for prejudice stemming from improper . . . comments can be satisfactorily dispelled by appropriate curative

- 30 -

instructions.'" (quoting Pagán-Ferrer, 736 F.3d at 587)).  During

its questioning of one witness, for example, the district court

told the jurors that "[they could] throw [the court's questions]

in the wastepaper basket."  And when charging the jury, the

district court reiterated that sentiment:

> During the course of trial, I occasionally asked
> questions of a witness in order to bring out facts not
> fully covered in the testimony.  Do not assume that I
> hold any opinion on the matters to which my questions
> are related.  Remember that at all times, you as jurors
> are at liberty to disregard all comments of the Court in
> arriving at your own findings of the facts.

As in Candelaria-Silva, "the strong instructions given by the trial

court during and at the end of the trial . . . eliminated any

conceivable prejudice."  166 F.3d at 36.

## C.  Flow's cross-examination

The defendants contend that the district court

impermissibly limited Flow's cross-examination in three areas:

charges pending against him, uncharged murders, and recorded jail

calls.  Although the defendants preserved only the second of these

challenges, all three would fail even if preserved.  So, favorably

to the defendants, we will review these three areas for abuse of

discretion, while reviewing de novo whether the defendants had "a

reasonable opportunity to impeach" Flow.  United States v. Casey,

825 F.3d 1, 24 (1st Cir. 2016).

The Sixth Amendment guarantees criminal defendants the

right of cross-examination; a district court, however, has

"considerable discretion to impose reasonable limits" on it.  Id.
at 23-24 (citation omitted).  "To establish that the district court
has abused its discretion, the defendant[s] must show that the
limitations imposed were clearly prejudicial."  United States v.
Ofray-Campos, 534 F.3d 1, 37 (1st Cir. 2008) (quoting United States
v. Williams, 985 F.2d 634, 639 (1st Cir. 1993)).  "The ultimate
question is whether 'the jury is provided with sufficient
information . . . to make a discriminating appraisal of a witness's
motives and bias.'"  United States v. Landrón-Class, 696 F.3d 62,
72 (1st Cir. 2012) (quoting DiBenedetto v. Hall, 272 F.3d 1, 10
(1st Cir. 2001)).  We consider the three challenged areas in turn.

### 1.  Pending charges

The district court's restriction of cross-examination
into Flow's pending state-court charges was not clearly
prejudicial.  The defendants were able to inform the jury of:
Flow's prior criminal convictions; the existence of Flow's
cooperation agreement with the government (potentially reducing
Flow's incarceration from a term of life to a government-
recommended 87 months); and Flow's personal dislike for the
defendants.

### 2.  Uncharged murders

Seeking to discredit Flow at trial, the defense implied
that Flow had killed five people, which he denied.  At sidebar,
Gómez's counsel claimed to have witnesses who could testify about

these uncharged murders. The district court ultimately struck these questions and answers based on Federal Rule of Evidence 608. On appeal, the defendants argue that "involvement in murders where there has been no conviction is a proper subject of cross-examination since it is part of the benefits received by cooperating." The district court's contrary decision was not an abuse of discretion. See United States v. Thomas, 467 F.3d 49, 56 (1st Cir. 2006) (stating that evidence rules allow judge to exclude extrinsic evidence on a collateral matter, whether offered to prove character for truthfulness or some other impeachment ground, like bias or contradiction).

### 3. Jailhouse calls

The same rationale suffices to dispose of the defendants' argument that the district court erred by not admitting certain of Flow's jailhouse phone calls. See United States v. DeCologero, 530 F.3d 36, 60 (1st Cir. 2008) (noting judge's discretion under Federal Rule of Evidence 403 to exclude extrinsic evidence of witness's bias). In any event, Flow admitted on cross-examination to many statements contained in the recordings that informed his motivation to testify, such as: that "these people from La Perla, they treated me really bad;" that he "hate[d]" some of the defendants; and that if he "talk[ed]," he expected to get a sentence between "two, three or four years only." The jury had

sufficient information to discern Flow's possible bias.  There was no reversible error here.

## D.  Uvaldo-Gomez's testimony

Manuel Uvaldo-Gomez[8], a government informant, testified that he tried to get involved in the conspiracy by approaching a woman, Drucaste, who told him about the conspiracy's operations, such as bringing drugs into the community through the piers.  Gómez and Hernández, both of whom worked at the piers at various times relevant to the charged conspiracy, objected to these statements' admission as hearsay.  The district court admitted them as nonhearsay party-opponent statements by a coconspirator under Federal Rule of Evidence 801(d)(2)(E).

As the statements' proponent, the government must prove by a preponderance of the evidence that "the declarant," Drucaste, "and the defendant[s]," Gómez and Hernández, "were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977).  We review the defendants' preserved challenges for clear error.  United States v. Ciresi, 697 F.3d 19, 25-26 (1st Cir. 2012) (citations omitted).

---

[8] The witness's name appears as "Osvaldo-Gomes" in the appellants' briefs but as "Uvaldo-Gomez" in the government's brief.

Although a closer question than the government admits, the district court's determination that Drucaste and the defendants were members of the same conspiracy was not erroneous. Because of the deferential standard of review, a defendant seeking to overturn a trial court's Petrozziello ruling carries a heavy burden:

> A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Where the evidence is susceptible of two plausible interpretations, the trier of fact's choice between them cannot be clearly erroneous.

United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003) (quoting Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1080 (1st Cir. 1995)).

"[A] coconspirator's statement, standing alone, is insufficient to meet the preponderance standard [and] some extrinsic proof of the declarant's involvement in the conspiracy [is required]." Id. at 258 (quoting Sepulveda, 15 F.3d at 1181). Such proof exists here: Uvaldo testified to his own knowledge of Drucaste's involvement in the drug-trafficking conspiracy; indeed, that is why he went to her to inquire about how he himself could join the conspiracy. The defendants conceded as much at trial -- their objections concerned not whether Drucaste was a coconspirator, but whether her statements were in furtherance of the conspiracy.

Drucaste's statements were in furtherance of the conspiracy because they "tend[ed] to promote one or more of the objects of the conspiracy." Ciresi, 697 F.3d at 28 (quoting United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002)).[9] She told Uvaldo to talk to "a Dominican who was a runner for Cascote" if he wanted to "become a pusher." Such a statement "made for the purpose of inducing or continuing participation in the conspiracy [is] in furtherance of the conspiracy." Id. at 29 (quoting United States v. Pelletier, 845 F.2d 1126, 1128 (1st Cir. 1988)). And she told Uvaldo that incarcerated conspiracy members' families would be provided money and that the drugs came in through the piers. "[S]haring . . . pertinent information about a conspiracy's mode of operation furthers the conspiratorial ends." Id. (quoting Sepulveda, 15 F.3d at 1181).

## VII. Prosecutor's behavior

The defendants collectively raise about a half-dozen claims of prosecutorial misconduct throughout the trial. We review preserved claims de novo and unpreserved claims for plain error. United States v. Sepúlveda-Hernández, 752 F.3d 22, 31 (1st Cir. 2014) (citations omitted). Either way, we may first consider whether the government's conduct was, in fact, improper. See

---

[9] For Rule 801's purposes, it matters not that Uvaldo was a government informer when Drucaste spoke to him about the conspiracy. See Ciresi, 697 F.3d at 28 & n.5.

- 36 -

United States v. Duval, 496 F.3d 64, 78 (1st Cir. 2007).  If so, we will only reverse if the misconduct "so poisoned the well that the trial's outcome was likely affected."  United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015) (quoting United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011)).  Four factors guide our analysis:

> (1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant.

Id. (quoting Kasenge, 660 F.3d at 542) (alteration omitted).

In short, we find the well untainted.  Most of the defendants' claims "lack arguable merit," so we do not discuss them further.  Rose, 802 F.3d at 117.  The arguably closer calls, to which we turn next, miss the mark for reversible error.

A.  Withdrawing the Federal Rule of Evidence 404(b) request

The government indicated that it intended to introduce prior-bad-acts evidence relating to drug-trafficking convictions against Gómez and Hernández.  The district court instructed the jurors that they were "about to be presented documentary evidence [that Gómez and Hernández] committed acts similar to those charged in this case."  After a brief recess, the government changed its mind and told the district court that it would not seek to introduce this evidence after all.  Gómez and Hernández maintain

- 37 -

that the prosecutor committed misconduct by allowing the jury to hear the judge's instruction and then not presenting the evidence -- and that this misconduct led the jury to speculate as to the defendants' previous trafficking activities, thereby leaving them in a worse position than they would have been in had the actual evidence been introduced.

We are unconvinced. Assuming only for argument's sake that withdrawing a valid Rule 404(b) request and not presenting prior-bad-acts evidence is misconduct, the district court gave two curative instructions (one immediately after the government announced that it would not introduce the evidence, and one when charging the jury). And the defendants concede that the government "had sufficient direct evidence to obtain a conviction" without the Rule 404(b) evidence. In these circumstances, there was no reversible misconduct.

B. Government objections during defense direct examination

Gómez argues that the prosecutor's constant objections during his direct examination of two defense witnesses disrupted the testimonies' flow and undermined his case. There was no misconduct here: the district court sustained nineteen of the prosecutor's twenty-three objections during the first witness's direct examination and overruled five of ten objections during the second witness's direct examination. See Sepúlveda-Hernández, 752 F.3d at 32 (stating that no misconduct when "[m]ost of the

- 38 -

objections . . . were either sustained by the court or elicited clarifications" and further noting that "the failed objections . . . do not seem so groundless as to be vexatious").

C.  Closing argument

The defendants argue several different theories of prosecutorial misconduct during the government's closing argument, none of which constitutes reversible error.

1.  Parties' roles

First, the defendants claim that the prosecutor improperly commented on the parties' roles and strengthened his personal credibility by, among other things, telling the jury "I represent the United States government."  After carefully reviewing the record and the parties' briefs, we conclude that the prosecutor's simple factual statement did not improperly "place[] the prestige of [his] office behind the government's case," United States v. Vizcarrondo-Casanova, 763 F.3d 89, 95 (1st Cir. 2014) (quoting United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003)), nor did it improperly describe the parties' roles.  Cf. United States v. Manning, 23 F.3d 570, 573 n.1 (1st Cir. 1994) (noting it was improper to "liken [defense attorneys] to Shakespeare's players, full of sound and fury signifying nothing").

## 2. Vouching

The defendants' second claim, that the prosecutor improperly vouched for the credibility of government witnesses, is a closer call. Improper vouching can occur when a prosecutor implies "that the jury should credit the prosecution's evidence simply because the government can be trusted." Vizcarrondo-Casanova, 763 F.3d at 95 (quoting Pérez-Ruiz, 353 F.3d at 9). Here, in his rebuttal argument, the prosecutor discussed the defense's closing arguments relating to the credibility of government witnesses:

> They want you to believe the bad things that don't implicate their client, but they want you to know the good things. You makes [sic] that choice. You are the judges. You decide who you want to believe, what you want to believe, and how you want to believe it. But in order to find any of these defendants not guilty, you are going to have to disbelieve all the cooperators. In other words, where are we getting our witnesses if the only witnesses that we can get in this case are all liars?

As in Vizcarrondo-Casanova, we think that the prosecutor "unwisely put his toes up to the line." 763 F.3d at 96 (finding no "clear and obvious" error when the prosecutor argued that government witnesses' inconsistent statements enhanced credibility because the government could have gotten the witnesses into a room together and had them create a consistent story). But we recognize that "[t]he line between the legitimate argument that a witness's testimony is credible and improper 'vouching' is often a hazy one,

- 40 -

to be policed by the trial court in the first instance." Id. (quoting Innamorati, 996 F.2d at 483). And here, the district court did not sustain the defense objection to the prosecutor's argument.

Even if this argument were improper, it did not likely affect the trial's outcome, so it would not warrant reversal. First, any misconduct was not severe: though "one might read into the rebuttal here a suggestion that the government itself concluded that the stories were credible," id., this is a far cry from the sorts of credibility arguments that merit reversal. See Vázquez-Larrauri, 778 F.3d at 284 (collecting cases). Second, the context militates against reversal. At closing, the defendants argued extensively that the government witnesses were "bought and paid for witnesses" whose testimonies "have to be rejected completely" because "[t]here is no reason to trust a liar." Cf. Vizcarrondo-Casanova, 763 F.3d at 96 (noting hesitance to find misconduct when defense counsel "pretty much invited the rebuttal" by suggesting that the government's witnesses were liars). Third, not only did the judge instruct the jury that the lawyers' arguments were not evidence, but the prosecutor himself, in the very statement complained of, also told the jurors that they alone were "the judges" of witness credibility. In these circumstances, any prosecutorial misconduct did not "so poison the well that the

trial's outcome was likely affected." Vázquez-Larrauri, 778 F.3d at 283.

### 3. Teton's murder

Finally, Gómez and Setiawan argue, albeit with different points of emphasis, that the prosecutor committed misconduct by referring to Teton's murder in his closing argument. We can easily dispose of Gómez's argument. The prosecutor argued that the jury could find that Gómez could have foreseen that "drug traffickers would be carrying weapons and doing what drug traffickers do, like Bryant Setiawan Ramos [sic] and Teton." The prosecutor clarified on rebuttal that "in no way did [he] suggest that Mr. Jorge Gómez Gonzalez [sic] was involved in the murder of Teton." The district court gave a prompt instruction that there was "no evidence that Jorge Gómez Gonzalez [sic] was anywhere near that overt act." Even if the statement were improper, this instruction was enough to cure any prejudice. See Olszewski v. Spencer, 466 F.3d 47, 59-60 (1st Cir. 2006) ("This court has consistently held that where the prosecutor unintentionally misstates the evidence during closing argument, a jury instruction ordinarily is sufficient to cure any potential prejudice, particularly where, as here, the instruction was given immediately after the statement.") (quoting United States v. Bey, 188 F.3d 1, 9 (1st Cir. 1999)) (internal quotation marks omitted).

Setiawan objects, for the first time on appeal, that the prosecutor repeatedly referred to Teton's murder for the impermissible purpose of inflaming the jury's passions. In addition to the remark that Gómez points out, the prosecutor also said that "Teton is dead. . . . [He is a] victim[] of drug trafficking;" and "[one witness] testified that he was there that evening Bryant Setiawan Ramos [sic] ended the life of another seller named Teton. And Teton hasn't come back." Although we vacate Setiawan's convictions on separate grounds, we note that these comments were not improper because they served a non-inflammatory purpose. Cf. Arrieta-Agressot v. United States, 3 F.3d 525, 527–28 (1st Cir. 1993) (citing examples of inflammatory language). The prosecutor introduced evidence at trial linking Setiawan to Teton's murder, which was presented as an act in furtherance of the conspiracy. Therefore, commenting on Teton's murder at several points in closing argument did not impermissibly "interject issues broader than [Setiawan's] guilt or innocence." Id. at 527 (quoting United States v. Machor, 879 F.2d 945, 956 (1st Cir. 1989)).

In conclusion, we find no basis in the prosecutor's conduct on which to disturb the convictions.

## VIII. Cumulative error

Perhaps sensing that they are fighting a rearguard action, all of the defendants contend that we must set aside their

- 43 -

convictions on a cumulative-error theory. Because we vacate Setiawan's convictions for the reasons discussed above, we consider the cumulative-error theory only as applied to Rosario, Hernández, and Gómez.

"[C]umulative-error analysis is inappropriate when a party complains of the cumulative effects of non-errors." United States v. Stokes, 124 F.3d 39, 43 (1st Cir. 1997) (citation omitted). And even if there were a few isolated incidents of concern during this eight-week trial, "we will order a new trial on the basis of cumulative error only if multiple errors synergistically achieve 'the critical mass necessary to cast a shadow upon the integrity of the verdict.'" Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998) (quoting Sepulveda, 15 F.3d at 1196). Therefore, we cannot reverse these convictions on the basis of cumulative error either.

For the foregoing reasons, we affirm the convictions of Rosario, Hernández, and Gómez but vacate Setiawan's convictions and remand his case for proceedings consistent with this opinion.